VIRGINIA:
## IN THE CIRCUIT COURT FOR THE COUNTY OF LOUDOUN

KRISTOPHER T. FRALEY,                       )
                                            )
    **Plaintiff**                              )
                                            )
v.                                          )
                                            )
TOWN OF PURCELLVILLE,                       )
                                            )
ALEXANDER VANEGAS,                          )          Case No. CL19002940-00
                                            )
GEORGIA NUCKOLLS,                           )
    d/b/a PROHR, INC.,                    )
    a/k/a THEADORA NUCKOLLS,              )
    f/k/a GEORGIA HERRON,                 )
                                            )
JOSEPH SCHROECK,                            )
                                            )
CLARK McDANIEL,                             )
                                            )
DARYLL DeBOW, and                           )
                                            )
NORTHERN VIRGINIA PRE-EMPLOYMENT )
& POLYGRAPH SERVICES,                       )
                                            )
    **Defendants.**                            )

## COMPLAINT

**COMES NOW**, the Plaintiff, KRISTOPHER T. FRALEY, by counsel, and moves for judgment against the Defendants for the relief and upon the causes of action as follows:

## NATURE OF THE ACTION

1.    The circumstances of the Complaint relate to the extraordinary efforts taken by the Town of Purcellville through its officials, officers, employees, contractors, and agents to remove the Town's Chief of Police, and, in doing so, maliciously, improperly, and without cause damage the professional reputation of the Plaintiff, a law enforcement officer on the Town's police force.

**EXHIBIT**

A

2.     The causes of actions herein seek to compensate the Plaintiff for the damages he sustained through the actions of the Town and those participating individuals and entities named above as defendants.

## PARTIES

3.     The Plaintiff Kristopher T. Fraley ("Officer Fraley") is a thirty-three (33) year old employee of the Town of Purcellville as a law enforcement officer with the Purcellville Police Department.

4.     The Defendant Town of Purcellville ("Town") is an incorporated Town within Loudoun County.

5.     The Defendant Alex Vanegas ("Vanegas") is an individual who was formerly employed by the Town as its Interim Town Manager and is a resident of Prince William County.

6.     The Defendant Georgia Nuckolls ("Nuckolls") is an individual who was retained and employed by the Town and is a resident of Loudoun County.

7.     The Defendant Joseph Schroeck ("Lieutenant Schroeck" and/or "Acting Chief Schroeck") is a former law enforcement officer for the Town, now retired from that position, and is a resident of Delaware.

8.     The Defendant Clark McDaniel ("Sergeant McDaniel") is a former law enforcement officer for the Town, now believed to be employed in the same capacity by Warren County, Virginia, and is a resident of Martinsburg, West Virginia.

9.     The Defendant Northern Virginia Pre-Employment & Polygraph Services ("Nova Poly") is a Virginia corporation engaged in the business of providing polygraph services to government and commercial employers with a registered business address of 7885 Coppermine Drive, Manassas, Virginia.

2

10.     The Defendant Daryl DeBow ("DeBow") is the owner and operator of Nova Poly, is a Polygraph Examiner licensed to practice in Virginia (license #1601000666), and is a resident of Loudoun County.

### JURISDICTION AND VENUE

11.     This Court has jurisdiction under Va. Code Ann. § 8.01-328.1 for the following reasons:

   a. The Defendant Town is a municipal corporation located and operating in the Commonwealth of Virginia.

   b. Defendant Vanegas is an individual residing and employed in Virginia and whose acts done in the Commonwealth have caused tortious injury to Plaintiff.

   c. Defendant Nuckolls is an individual residing in Virginia and whose acts done in the Commonwealth have caused tortious injury to Plaintiff.

   d. The actions of Defendant Joseph Schroeck committed in the Commonwealth have caused tortious injury to Plaintiff.

   e. The Defendant Sergeant McDaniel is an individual employed in Virginia and whose acts done in the Commonwealth have caused tortious injury to Plaintiff.

   f. Defendant Nova Poly is a Virginia corporation that transacts business in the Commonwealth of Virginia.

   g. Defendant DeBow is a Polygraph Examiner licensed and regulated by the Virginia Department of Professional and Occupational Regulation, resides in Virginia, and whose acts done in the Commonwealth have caused tortious injury to Plaintiff.

12.     Venue is permissible and proper in this Court under Va. Code Ann. §§ 8.01-262(1), (3), and (4) because the Defendants Nuckolls and DeBow reside in Loudoun County, Defendant Town's principal place of business is located in Loudoun County, the fact witnesses and other evidence to this action are located in Loudoun County, and all causes of action set forth herein arose in Loudoun County.

## MATERIAL BACKGROUND FACTS

13.     Officer Fraley was hired by the Town in January of 2015 to serve as a law enforcement officer for the Town of Purcellville Police Department ("PPD" or "Department"). Officer Fraley has performed his duties on behalf of the Town and its residents with distinction, regularly garnering multiple commendations and awards for his professionalism and enforcement.

14.     At the time of Officer Fraley's hiring, the Department was led by Chief Darryl C. Smith ("Chief Smith"). On or about April 1, 2015, soon after Officer Fraley on-boarded, Chief Smith resigned and retired from the Department.

15.     Thereafter, the Town hired Police Chief Cynthia McAlister ("Chief McAlister") to replace Chief Smith.  Chief McAlister was an external, direct hire from the Fairfax County Police Department, and she was the first female ranking officer in the history of the Department.

### CONSPIRACY TO REMOVE CHIEF MCALISTER

16.     On June 15, 2015, Chief McAlister began her tenure as Chief of the PPD.  Her stated intention was to modernize and improve the Department's public image and effectiveness, and to raise the standard of professionalism expected of PPD personnel to meet contemporary police department standards. Chief McAlister's management style emphasized the importance of

4

accountability, professionalism, and integrity of PPD personnel in the performance of their duties.

17. The preexisting internal culture of the Department at the time of Chief McAlister's appointment was one of lax enforcement of the Department's internal regulations and standards of conduct. Senior officers within the Department became accustomed to a lack of PPD oversight and supervision.

18. Chief McAlister's objectives and approach stood in contrast to the Department's culture established during Chief Smith's tenure. Following the implementation of updated and revised internal Department standards and regulations, Chief McAlister began diligently enforcing the updated regulations and pursuing appropriate disciplinary action in response to violations of these regulations by individual Department employees. Ultimately, in addition to other consequences, the Chief's efforts led to initiation of internal affairs investigations of two PPD law enforcement officers, Officer Timothy Hood and Sergeant Guy Dinkins, which resulted in their termination from employment with the Department.

19. The implementation and enforcement of Chief McAlister's new standards met significant internal resistance from the Department's senior officers, who resented the changing focus and their increased responsibility and accountability. These senior officers, among them Lieutenant Schroeck and Sergeant McDaniel, began to express their discontent with Chief McAlister's leadership. These senior officers actively sought the removal of Chief McAlister and to have her replaced with Lieutenant Schroeck, who was expected to significantly relax the standard of accountability for the senior officers.

20. To carry out this effort, these senior officers began to coordinate and circulate manufactured and pretextual grievances against Chief McAlister, both within the Department

and to Town leadership, with the goal of hurting Department morale and placing political pressure upon Town officials to compel Chief McAlister's termination.

ACTIONS OF TOWN COUNCIL

21.    By the beginning of 2016, several elected officials, including four Town Council members, (collectively, the "Four Council Members") were openly committed to removing and replacing Chief McAlister. In addition to any credence given to the grievances expressed by the senior officers of the Department, the Four Council Members had personal differences with Chief McAlister. Further, some had voiced different views as to the future role, if any, of the Department as the Town's law enforcement agency.

22.    During this period, the Town Council both openly and privately discussed replacing or supplementing the Department with assets of the Loudoun County Sheriff's Office. However, such efforts were met with public opposition and shelved. Notwithstanding this opposition, the Four Council Members remained committed to removing Chief McAlister.

23.    On or about April 25, 2017, the then-Town Manager, Robert Lohr Jr. ("Lohr"), announced his early retirement after having been pressured by several members of Town Council, including the Four Council Members, so as to exert stronger control over the Town government and personally direct change in Town management. The Four Council Members wanted to use the opportunity to change the Department generally and remove Chief McAlister specifically.

24.    At that time, Mr. Vanegas was serving as Director of Public Works for the Town and announced his intention to compete for the vacant Town Manager position. The Four Council Members secured assurances from Mr. Vanegas that, should he be appointed as Interim

Town Manager, he would take such necessary actions to remove Chief McAlister from the Department.

25. Upon securing such assurances, the Town Council, with the affirmative votes of the Four Council Members, appointed Mr. Vanegas as Interim Town Manager in May 2017, effective on July 1, 2017. Mr. Vanegas' appointment was made over other, better qualified and more experienced applicants.

26. The Four Council Members were indifferent to Mr. Vanegas' lack of relevant qualifications and experience when they appointed him Interim Town Manager. Rather, they each voted in favor of his appointment based upon his agreement to terminate Chief McAlister.

27. To determine how to terminate Chief McAlister, the Town's agents sought and received advice from other sources, including local law enforcement outside the Department—specifically, Loudoun County Sheriff, Michael L. Chapman ("Sheriff Chapman"). Sheriff Chapman's animus toward Chief McAlister was well-known by the Four Council Members.

28. Through these communications, the Town's agents were introduced to and began to directly confer with Ms. Nuckolls on methods the Town could employ to effectuate the removal of Chief McAlister.

29. As a result, on or about July 27, 2017, Mr. Vanegas coordinated the simultaneous filing of formal complaints against Chief McAlister by at least six (6) of the senior officers within the Department, including Sergeant McDaniel and Lieutenant Schroeck. Many, if not all, of these complaints were unfounded, pretextual, and contained false allegations against Chief McAlister.

30. Mr. Vanegas hoped to use the fabricated complaints as a pretext to summarily terminate Chief McAlister and prepared a letter suggesting the same.

31.     However, Mr. Vanegas was advised by the Town Attorney that the complaints of the senior members of the Department were insufficient in and of themselves to summarily remove Chief McAlister and that a formal investigation would be necessary to determine the merit of the complaints and what, if any, consequences should result.

32.     Notwithstanding, because of the complaints, Mr. Vanegas was permitted to place Chief McAlister on administrative leave pending the investigation. Mr. Vanegas did do so on or about August 28, 2017, and, with the knowledge, approval, and understanding of the Four Council Members, opened a formal investigation of Chief McAlister (the "McAlister Investigation").

33.     Per agreement with the Department's senior officers, Lieutenant Schroeck was formally named Acting Chief of the PPD by Mr. Vanegas, pending the results of the investigation.

34.     Mr. Vanegas and the Four Council Members became concerned that other Town employees might frustrate the investigation on both substantive and procedural grounds. Specifically, Mr. Vanegas and the Four Council Members noted the resistance of the Town Attorney and the Town's Human Resources Manager to Mr. Vanegas' attempts to force Chief McAlister's termination, and, upon information and belief, both were placed on a written list, along with Chief McAlister, of Town employees that the Four Council Members and Mr. Vanegas wanted to terminate.

35.     Mr. Vanegas and the Four Council Members did not trust any member of the Town's Human Resources Department to conduct the investigation for fear that an investigation conducted internally might reveal the nature of the complaints and result in the retention of Chief McAlister.

36.     To avoid further internal resistance, Mr. Vanegas and the Four Council Members agreed that the Town should retain Ms. Nuckolls, ostensibly as an 'independent investigator,' to produce a result-oriented investigation of Chief McAlister by embedding her directly into the Town personnel system.  Such decision was made notwithstanding Mr. Vanegas' and the Four Council Members' indifference to meaningful qualifications or experience held by Ms. Nuckolls to conduct such investigation.

37.     In exchange for her complicity in the McAlister Investigation, Mr. Vanegas and the Four Council Members agreed that Ms. Nuckolls would ultimately be hired by the Town in the position of the Town's Human Resources Manager, following the termination of Chief McAlister.

38.     Ms. Nuckolls agreed to the idea and was offered and accepted the consulting position by Mr. Vanegas in writing in a September 21, 2017 email.  **See email thread between Nuckolls and Vanegas attached hereto as Exhibit 1.** Such offer was made with the approval and understanding of the Four Council Members.

39.     The following day, Ms. Nuckolls further ratified the idea that she would be embedded within the Town as an independent investigator.  **See email from Nuckolls to Vanegas regarding Chapman, attached hereto as Exhibit 2.**

<u>HIRING OF MS. NUCKOLLS BY THE TOWN</u>

40.     The Town officials knew that in order to secure Ms. Nuckolls' services, the Town would first need to demonstrate the need for a position to procure Ms. Nuckolls' selection.  In part to create an official need, Mr. Vanegas, working with the knowledge of the Four Council Members, administratively suspended the Town's Human Resources Manager on pretextual grounds.

41.    To ensure that Ms. Nuckolls would be selected for the special consultant spot created, the Town, by and through Interim Town Manager Vanegas and with the agreement and acquiescence of the Four Council Members, could not reasonably open the bidding to other, qualified investigators.  Therefore, Mr. Vanegas and the Four Council Members intentionally ignored and bypassed the requirements of standard Town practices and the Virginia Public Procurement Act, codified at Va. Code Ann. §§ 2.2-4300, *et seq.* (the "Procurement Act").[1]

42.    No competitive bids were solicited by the Town.    Instead, Mr. Vanegas completed, executed, and submitted a Town Procurement Quotation Sheet on September 22, 2017 that included two additional supposed 'bids' for the position from other individuals and wherein ProHR, Inc. is represented as being the lowest-cost bidder.  **See Town Procurement Quotation Sheet attached hereto as Exhibit 3.**  These other 'bids' were neither solicited by nor submitted to the Town, but were merely quotes secured by Mr. Vanegas as to the hourly rates of

---

[1]    The Virginia Public Procurement Act sets forth the necessary procedure for governmental procurement of goods and services from nongovernmental sources. The stated purpose of the Procurement Act, in part, is to ensure that all public bodies (including local government entities) in Virginia adhere to fair and impartial procurement procedures and avoid any impropriety or appearance thereof in so doing, that no vendor, bidder, or offeror be "arbitrarily or capriciously excluded" from the bidding or negotiation process, that the specifications of the contract award reflect the public body's procurement needs and are not "drawn to favor a particular vendor." Va. Code Ann. § 2.2-4300(C). The explicit intent of the General Assembly in enacting the Procurement Act is "that competition be sought to the maximum feasible degree[.]" *Id.*
       The Procurement Act includes, in part, the following requirements: all public contracts with nongovernmental contractors must only be awarded after competitive sealed bidding or competitive negotiation (both of which are discussed in detail in the Procurement Act), with some narrow exceptions;  all procurement contracts must include certain provisions, including requiring all business entity-contractors be authorized to transact business in Virginia and not allow their business registration to lapse, or be revoked or cancelled at any point during the contract term; the public body shall select either the lowest-cost responsible bidder in a competitive sealed bidding process or the fully qualified offeror deemed best suited for the position in a competitive negotiation process; and prohibiting any public employee responsible for the procurement transaction from knowingly falsifying, concealing, or misrepresenting

the individuals identified therein in order to ensure that Ms. Nuckolls' rate would appear credible.

43.     Shortly thereafter, on September 25, 2017, the Town, by and through Mr. Vanegas, formally retained Ms. Nuckolls (doing business as ProHR, Inc., ostensibly an entity owned and operated by Ms. Nuckolls), to provide human resources consulting services for the Town and conduct the McAlister Investigation.  **See Contract Agreement attached hereto as Exhibit 4** ("Contract").

44.     Ms. Nuckolls never submitted any proof of insurance as required by the Contract. In fact, the corporate existence of ProHR, Inc. had been terminated by the Virginia State Corporation Commission at the time she contracted with the Town.  **See SCC Certificate of Fact regarding ProHR, Inc. attached hereto as Exhibit 5.**  A later audit of Ms. Nuckolls' investigation and findings revealed that none of her claimed credentials, certifications, or degrees were able to be verified. **See Section III, pp. 3-12, of the Public Report: Phase 1 attached hereto as Exhibit 6.**  The Town intentionally failed to make any attempt at corroborating Ms. Nuckolls' stated qualifications or credentials and awarded the contract to Ms. Nuckolls, d/b/a ProHR, Inc., in an email dated September 21, 2017 (see **Exhibit 2**).

45.     The Town procured the services of ProHR, Inc. and Ms. Nuckolls based wholly upon the understanding that her investigation of Chief McAlister would return findings that would give the Town authority and cover to remove of Chief McAlister from the PPD.  **See email from Nuckolls to Vanegas attached hereto as Exhibit 7.**

---

material facts, making false or fraudulent statements or representations, or creating or using any writing knowing it contains false or fraudulent statements.

46.     Moreover, while Ms. Nuckolls' Contract only authorized her to investigate the complaints from the senior PPD officers regarding Chief McAlister filed on July 27, 2016, Ms. Nuckolls and the Town, by and through Mr. Vanegas and the Four Council Members, agreed that she would be empowered to lead the Town's efforts to terminate Chief McAlister and ultimately conduct any additional investigations of other Department personnel as she deemed necessary to achieve that ultimate goal.

### OFFICER FRALEY'S REPORT TO MS. NUCKOLLS

47.     During the early part of 2016, Officer Fraley was a low-ranking 'road unit' for the Department.  He was not active in any of the efforts by senior officers of the Department to remove Chief McAlister.  However, he was aware of and professionally opposed to the concerted efforts of PPD senior officers to employ the use of baseless rumors and insinuations as a means to oust Chief McAlister.  Officer Fraley was understood throughout the Department to be generally supportive of Chief McAlister's efforts to modernize the Department.

48.     Officer Fraley became aware of a particular rumor being circulated by Sergeant McDaniel among Department personnel and related circles, that Chief McAlister was involved in an ongoing adulterous affair with another Town employee.  Sergeant McDaniel was Officer Fraley's direct supervisor and one of the PPD senior officers opposed to Chief McAlister's efforts to reform the Department.  Officer Fraley knew the rumor to be false and knew it was being disseminated for the sole purpose of undermining Chief McAlister's authority and integrity and to cause harm to her professional reputation.

49.     Given that Officer Fraley's superior was, in fact, Sergeant McDaniel, and that the other senior officers, including Acting Chief Schroeck, were openly advocating for Chief McAlister's removal, Officer Fraley felt both morally and professionally obligated to report

Sergeant McDaniel's misconduct in his widespread circulation of this unfounded rumor to the Town's Human Resources Department.

50.     Officer Fraley was aware of the Town's recent retention of Ms. Nuckolls as a human resources consultant and believed that she was hired to conduct an independent review, on the Town's behalf, of the complaints of PPD's senior staff. Officer Fraley was unaware that Ms. Nuckolls was in fact retained by Mr. Vanegas and the Town to perform an outcome-determinative investigation of Chief McAlister. Officer Fraley was also unaware of the extent to which Mr. Vanegas had already been working with the senior members of the Department, including Sergeant McDaniel, to terminate Chief McAlister.

51.     Therefore, on October 6, 2017, Officer Fraley naively and in good faith initiated a meeting with Mr. Vanegas and Ms. Nuckolls to report Sergeant McDaniel's misconduct. During this meeting, Officer Fraley disclosed to Mr. Vanegas and Ms. Nuckolls his full understanding of the nature of the rumor regarding Chief McAlister, the motives of the persons involved in concocting and spreading the rumor, and his knowledge of Sergeant McDaniel's active role in its dissemination. Officer Fraley was thanked by Mr. Vanegas and Ms. Nuckolls for bringing the matter to their attention and was advised that there would be a follow up meeting soon scheduled.

52.     Immediately thereafter, upon information and belief, Mr. Vanegas and Ms. Nuckolls consulted with Acting Chief Schroeck, and Sergeant McDaniel regarding Officer Fraley's report of Sergeant McDaniel's actions. The four of them acknowledged that, if his allegations were found to be substantiated and became public, Sergeant McDaniel's involvement in proliferating the malicious rumor would undermine their efforts to remove Chief McAlister. They agreed that Officer Fraley must be immediately publicly discredited and removed from

13

duty as a PPD law enforcement officer as soon as possible. **See Emails between Nuckolls and Schroeck with subject "IA Case" attached hereto as Exhibit 8.**

INTERNAL AFFAIRS INVESTIGATION OF OFFICER FRALEY

53.     Ms. Nuckolls, Mr. Vanegas, Acting Chief Schroeck, and Sergeant McDaniel agreed that the most efficient way to remove and discredit Officer Fraley would be to quickly open and secure a finding in a Department internal affairs investigation on Officer Fraley (the "Fraley Investigation").

54.     They agreed to open the Fraley Investigation upon certain pretextual 'concerns' regarding Officer Fraley's witness testimony in the prior internal affairs investigations of the two officers who were ultimately terminated from the Department during Chief McAlister's tenure: Officer Hood and Officer Dinkins. Discrediting and terminating Officer Fraley upon these pretexts would also create an opportunity to reinstate in the future one of the officers, Officer Hood, back into the Department. Officer Hood's wife was Mr. Vanegas's assistant. **See email from Nuckolls to Hood attached hereto as Exhibit 9.**

55.     To assist the investigation, Mr. Vanegas, Ms. Nuckolls, Acting Chief Schroeck, and Sergeant McDaniel sought the services of a polygraph examiner in the hopes that a polygraph examination might indicate some sign of deception, which they could point to as a basis for dishonesty, and therefore, use as a basis to terminate Officer Fraley's employment.

56.     Ultimately, Ms. Nuckolls secured the services of Daryl DeBow, a licensed polygrapher with Nova Poly and with whom she was familiar with as a result of her contacts with other law enforcement agencies in Loudoun County.   She advised Mr. DeBow of the 'allegations' against Officer Fraley and of her desire for the examination to produce a report reflecting some indicia of deceptiveness.

14

57.     Mr. DeBow agreed to participate in the Fraley Investigation.  He further agreed to produce a report reflecting the desired finding of deceptiveness so requested by Ms. Nuckolls, even if doing so would ultimately require him to issue a report inconsistent with the actual test results.  Upon information and belief, it is understood that Mr. DeBow's assent to these actions were, in part, a *quid pro quo* byproduct of a sexual relationship he had with Ms. Nuckolls.

58.     Mr. DeBow and Nova Poly are nongovernmental entities that provided a service to the Town, at the behest of Ms. Nuckolls and with Mr. Vanegas' approval, in exchange for which they received monetary compensation. As such, the Procurement Act applied to the acquisition of Mr. DeBow and Nova Poly for the contracted-for polygraph examination of Officer Fraley. However, the Town, by and through the actions of Mr. Vanegas and Ms. Nuckolls, failed or refused to comply with several provisions of the Procurement Act, including but not limited to the failure to issue a public notice of the Town's contract for a polygrapher and lack of any competitive negotiation or sealed bidding process.

59.     Meanwhile, shortly after having made his initial report of Sergeant McDaniel's misconduct, Officer Fraley went on bereavement leave following the loss of his grandmother on October 10, 2017.  Officer Fraley's leave status was made known to Ms. Nuckolls, Mr. Vanegas, Sergeant McDaniel, and Acting Chief Schroeck, and it was reasonably understood that this was a significant emotional loss for Officer Fraley. **See PPD email attached hereto as Exhibit 10.**

60.     Notwithstanding, now having secured Mr. DeBow's commitment to assist in the Fraley Investigation, on the evening of the day in which Officer Fraley went on bereavement leave, Ms. Nuckolls advised Officer Fraley that she had "carved out time" for him to meet with her at 11:00am on October 12, 2017 at the Town Hall (the "Town Hall Meeting"). **See email from Nuckolls to Fraley attached hereto as Exhibit 11.** Officer Fraley was still unaware of

the ulterior motives of Ms. Nuckolls and Mr. Vanegas and agreed to come in during his bereavement leave to meet for what he understood to be a simple follow-up to their October 6, 2017 conversation pertaining to Sergeant McDaniel's misconduct.

61.     In anticipation of the meeting, the Town's agents wanted to limit the availability of any tangible evidence showing the events of the Town Hall Meeting.  Thus, Mr. Vanegas, in his capacity as Interim Town Manager, ordered that the video surveillance system for the conference room and parts of the Town Hall where the meeting was scheduled to take place be blocked and restricted. **See email from Vanegas attached hereto as Exhibit 12.**

62.     Officer Fraley appeared as scheduled for the Town Hall Meeting, still expecting the meeting to be a follow-up to the earlier meeting regarding Sergeant McDaniel's misconduct.  However, upon entrance, Officer Fraley was immediately advised that the true purpose of the meeting regarded the PPD internal affairs investigation against him.  Present at the meeting were Ms. Nuckolls, Sergeant McDaniel, and Mr. DeBow.

63.     Ms. Nuckolls and Sergeant McDaniel provided Officer Fraley with a copy of the Investigation Notice. **See Notification of Investigation attached hereto as Exhibit 13.**  Officer Fraley was then directed to surrender his Department-issued firearm to Sergeant McDaniel.[2]  Mr. DeBow performed a search of Officer Fraley's person and physically removed several of Officer Fraley's personal items. As he was removing Officer Fraley's badge, Mr. DeBow stated to Ms. Nuckolls and Sergeant McDaniel, "he will not be needing this."  Officer Fraley was otherwise

---

[2] On October 11, 2017, the day before the Town Hall Meeting was to take place, Sergeant McDaniel directed Officer Fraley to carry his Department-issued firearm on his person at all times within Town limits, regardless of whether he was on light-duty status.  Sergeant McDaniel's order was inconsistent with previous orders given to similarly situated officers and was issued to Officer Fraley for the purpose of ensuring that he would bring his Department-issued firearm to the Town Hall Meeting so that it could be confiscated.

physically barred from exiting the room and was further advised that if he did not comply with the polygraph examination, he would be immediately terminated. During the performance of the polygraph examination, Mr. DeBow asked questions of Officer Fraley that were ambiguous and specifically intended to induce a certain level of uncertainty in his answers.

64.     These efforts, including the timing of the examination during his bereavement leave, were taken in a direct effort to unnerve Officer Fraley and to induce examination results showing indications of avoidance and/or evasiveness by Officer Fraley.

65.     At the conclusion of the polygraph examination, Mr. DeBow advised Ms. Nuckolls that Officer Fraley had shown signs of deception in the examination. Upon hearing Mr. DeBow's findings, Ms. Nuckolls directed Sergeant McDaniel to present Officer Fraley with a Relief of Duty Notice; notably, this Notice had been prepared ahead of the Town Hall Meeting and was the only document Sergeant McDaniel brought to the meeting. **See Relief of Duty Memorandum attached hereto as Exhibit 14.** Officer Fraley was advised that he was now suspended from duty and that Sergeant McDaniel would be forwarding a recommendation of termination to Acting Chief Schroeck.

66.     In fact, the results of Mr. DeBow's polygraph examination of Officer Fraley showed no signs of deception. Nevertheless, Mr. DeBow's report of these results instead reflected his pre-existing agreement with Ms. Nuckolls and the Town to create a mechanism by which Town officials could discredit Officer Fraley's integrity, honesty, and reputation as a law enforcement officer. Mr. DeBow's report initial oral report and subsequent written report intentionally misrepresented the results of the polygraph examination and failed to meet the professional standards promulgated by the Virginia Department of Professional and Occupational Regulation regarding polygraph examiners licensed in Virginia.

67.     Evidence of the personal relationship between Mr. DeBow and Ms. Nuckolls was captured by the Town Hall elevator surveillance system only minutes after the conclusion of the Town Hall Meeting. **See elevator surveillance photos attached hereto as Exhibits 15a and 15b.**

68.     Procedurally, the Fraley Investigation was fatally flawed and non-compliant with multiple PPD General Orders, including that Ms. Nuckolls was not a law enforcement officer; Sergeant McDaniel, who was the subject of an internal complaint by Officer Fraley, was named lead investigator for the investigation; Officer Fraley was neither interviewed nor given an opportunity to provide a written or recorded statement; and any notices of suspension could only be issued by Acting Chief Schroeck.

69.     Further, the decision to place Officer Fraley on administrative leave was done in specific violation of Va. Code Ann. § 40.1-51.4:4(B), which states that no employee of a law enforcement agency in Virginia may be subject to an adverse employment decision or discrimination based solely upon the results of a polygraph examination.

70.     Further still, in conducting the Fraley Investigation, Mr. Vanegas, Ms. Nuckolls, Sergeant McDaniel, and Acting Chief Schroeck intentionally, willfully, and wantonly violated and disregarded Officer Fraley's rights established by the Law-Enforcement Officers Procedural Guarantee Act, codified at Va. Code Ann. §§ 9.1-500, *et seq.* (the "Police Bill of Rights") and Chapter 152 of the PPD General Orders Manual, in addition to Virginia's Fraud and Abuse Whistle Blower Protection Act, codified at Va. Code Ann. §§ 2.2-3009, *et seq.*

71.     Notwithstanding such known and obvious infirmities of the investigation, Officer Fraley was suspended pending termination and directed to await a forthcoming Notice for Termination from Acting Chief Schroeck.

POST-SUSPENSION EFFORTS BY THE TOWN

72.     Immediately following Officer Fraley's suspension, the Town's agents collaborated to ensure that news of Officer Fraley's pending termination would be rapidly published throughout the Loudoun County judicial system, including the Courts and the Loudoun County Commonwealth's Attorney.

73.     As a result, the Commonwealth's Attorney and the Courts publicly *nolle prosequied* entire dockets involving Officer Fraley's cases.

74.     Additionally, the Town's agents were aware that the allegations of Officer Fraley's 'untruthfulness' would trigger a direct responsibility by the Commonwealth Attorney's office to highlight all of Officer Fraley's reports as "Brady material." As a result, criminal defense attorneys who had matters pending with or involving Officer Fraley received affirmative disclosures from the Commonwealth Attorney's office as to the then-pending accusations against Officer Fraley. **See emails from Loudoun County Commonwealth's Attorney's Office attached hereto as Exhibit 16.**

75.     The widespread circulation of Officer Fraley's suspension from the Department due to his supposed untruthfulness resulted in public motions and Sergeant McDaniel being subpoenaed to testify as to the allegations against Officer Fraley at a hearing for a defendant charged with felony DWI, the defendant's sixth such charge in ten years.

76.     The rumors that Officer Fraley was to be terminated due to questions related to his honesty and integrity resonated through the entire Loudoun County law enforcement community. As they continued to circulate, questions of his integrity and capacity to serve as a law enforcement officer spread into law enforcement agencies in other jurisdictions, including his home jurisdiction of Frederick County, Virginia.

19

77.     During the initial period related to Officer Fraley's administrative leave, he attempted to transfer to another law enforcement agency.  However, he was unable to secure alternative employment due to his suspension and the ongoing rumors initiated and circulated by the Town's agents pertaining to his integrity and fitness as a law enforcement officer.  Officer Fraley was subsequently advised that these rumors, discussion of the ongoing internal affairs investigation against him, and his current placement on administrative leave from the Department were so public that they would likely complicate and impede his receiving a favorable hiring decision from any other law enforcement agency.

78.     Procedurally, Officer Fraley's formal notice of termination was to be presented to him by Acting Chief Schroeck after completion of the written Proposal for Termination ("Proposal").  Acting Chief Schroeck delegated the drafting of the Proposal to Sergeant McDaniel, despite his having been the subject of Officer Fraley's complaint just days earlier.

79.     Consistent with the previous efforts to ensure Officer Fraley's termination and undermine his professional reputation and credibility, Sergeant McDaniel did willfully and maliciously write into the Proposal multiple misrepresentations and falsehoods relating to Officer Fraley's work performance and integrity.  Sergeant McDaniel even went so far as to falsify the details of a call for service to which Officer Fraley responded, in order to present Officer Fraley in a negative light.  The insertion of such false and misrepresentative narratives into an official police record reflects the specific, malicious intent of Sergeant McDaniel to defame Office Fraley's reputation and his commitment to terminate Chief McAlister.[3]

---

[3] Ultimately, the Proposal was never presented to Officer Fraley by Acting Chief Schroeck due to the Town suspending the termination proceedings against Officer Fraley after the investigative process had become exposed to the public.

REVELATIONS ABOUT MS. NUCKOLLS

80.     Soon after Officer Fraley was placed on leave pending his notice, Ms. Nuckolls formally released the results of her 'investigation' of Chief McAlister to Mr. Vanegas and the Town Council (the "Nuckolls Report"). The Nuckolls Report included multiple distortions and misrepresentations. As anticipated, the Report proved to be sufficient to form a basis for the Four Council Members' termination of Chief McAlister. On or about November 2, 2017, Chief McAlister faced a Vote of 'No Confidence' from the Town Council and was immediately terminated by Mr. Vanegas, acting in his capacity as Interim Town Manager.

81.     However, before Mr. Vanegas could follow through and respond to the Proposal for Termination regarding Officer Fraley, a fuller narrative of Ms. Nuckolls' background and her 'investigation' was revealed in various media outlets, including the fact that she had been convicted of multiple felonies, some or all of which were crimes of moral turpitude. The reports of Ms. Nuckolls' felony convictions and inquiry into the human resources experience and certifications claimed on her resume immediately brought further scrutiny of the conclusions in her Report. Ultimately, public doubts were raised as to all of her efforts on behalf of the Town, including the termination of Chief McAlister, the suspension of Officer Fraley, and the other adverse employment decisions made against those Town employees who were on the written list of Mr. Vanegas and the Four Council Members.

82.     Publicly, and despite the previous efforts of at least the Four Council Members, the Town Council as a whole was left with no other choice but to respond to the media attention by ordering an investigation into the actions of Ms. Nuckolls and Mr. Vanegas, resulting in the termination of Ms. Nuckolls' contract by November 17, 2017 and Mr. Vanegas being placed on administrative leave on November 21, 2017. However, the Town Council's actions also resulted

in Officer Fraley remaining on administrative suspension, as the Town halted the termination proceedings.

83.     Upon Ms. Nuckolls' separation, she continued to publish false, defamatory statements regarding Officer Fraley in an effort to maintain some degree of credibility for her Report. **See email from Nuckolls to Town Council attached hereto as Exhibit 17.** Additionally, on or about November 21, 2017, the Loudoun Tribune, an online newspaper, published a defamatory article that included information directly from the confidential Fraley Investigation. **See Loudoun Tribune Article attached hereto as Exhibit 18.** The published information was confidential and had been improperly misappropriated, retained, and disseminated by Ms. Nuckolls.

84.     Notwithstanding the glaring defects and bias of the Fraley Investigation and Ms. Nuckolls' termination, the Town failed to take any reasonable steps to restrict Ms. Nuckolls' access to the sensitive and confidential PPD files, records of previous internal affairs investigations, and other police records. Despite the Town being on notice that Ms. Nuckolls possessed such confidential information and that she was recklessly using the same, the Town took no affirmative steps to prevent the further dissemination of such confidential and damaging—though falsified—information.

<u>TOWN'S FOLLOW-UP INVESTIGATION</u>

85.     At least as early as November 17, 2017, and evidenced by the Town's termination of Ms. Nuckolls' contract, the Town leadership knew that all Ms. Nuckolls' investigative efforts and findings, including those related to the Fraley Investigation, were wholly unreliable and could not rightfully be a basis for any employment decision, including the continued administrative suspension of Officer Fraley. The Town had a duty to timely reinstate Officer

Fraley upon receiving knowledge that the Fraley Investigation was inherently flawed, baseless, and predicated upon such false and maliciously produced information.

86.    Notwithstanding this duty, rather than rescind his suspension and reinstate Officer Fraley to the Department, the Town continued to keep him on administrative leave. This decision, without any clear direction given to the community at large, added to the law enforcement community's confusion regarding the validity of the Fraley Investigation's findings, especially in light of the then-active efforts by Sergeant McDaniel and Ms. Nuckolls to further defame and harm Officer Fraley's reputation.

87.    On November 21, 2017, the Town issued a news release which indicated that it was in the process of retaining another independent investigator, this time to audit and evaluate Mr. Vanegas' actions taken in his capacity as Interim Town Manager. **See Purcellville News Release attached hereto as Exhibit 19.**

88.    The Town Council secured the law firm of Wilson Elser Moskowitz Edelman & Dicker LLP ("Wilson Elser") to act as an independent auditor and investigator into the actions of Mr. Vanegas and Ms. Nuckolls. Wilson Elser's Audit and Investigation Report ("Wilson Elser Report") was deliberate and thorough, and took months to draft and produce. Phase 1 of the Wilson Elser Report was not released to the public until April 10, 2018. The Wilson Elser Report confirmed that all actions taken by Ms. Nuckolls were fatally flawed, both procedurally and substantively (**see Public Report: Phase 1 attached hereto as Exhibit 6**).

89.    The Town had notice of the information contained in Phase I of the Wilson Elser Report prior to its April 10 release date. Despite the findings set forth therein, the Town continued unnecessarily to keep Officer Fraley on administrative leave, again affirmatively

disregarding its duty to timely reinstate him to the PPD and to not unduly delay such reinstatement.

90.     As a direct result of the Town's failure to promptly cure Officer Fraley's wrongful suspension, rumors regarding his credibility, integrity, and performance as a law enforcement officer continued to circulate in the community and tacitly gave credence to the findings of the Fraley Investigation and Ms. Nuckolls' subsequent defamatory allegations regarding Officer Fraley.

91.     Wilson Elser released Phase II of their Report on July 31, 2019. Soon thereafter, on August 1, 2018, the Town reinstated Officer Fraley to his previous position within the Department. However, the Town's 10-month delay in reinstating Officer Fraley after notice that the Fraley Investigation was predicated upon the fatally flawed findings by Ms. Nuckolls was unjustifiable. The delay amounted to a breach of the Town's duty to mitigate the damage the Town caused by the initial suspension and resulted in Officer Fraley suffering further unnecessary harm to his professional reputation and prolonged his pain, suffering, and emotional distress.

92.     Furthermore, notwithstanding Wilson Elser's findings and recommendations, including written proof that Sergeant McDaniel falsified information in the Fraley Investigation and of his malicious intent in so doing, the Town continued to employ Sergeant McDaniel in a supervisory role at PPD even upon Officer Fraley's return. Until Sergeant McDaniel left the Department of his own accord, Officer Fraley faced continual retribution in the workplace in the form of further harassment by Sergeant McDaniel, including further false allegations made by Sergeant McDaniel. That members of the Department and other law enforcement officers bore witness to Sergeant McDaniel's continued employment with the Town further undermined

Officer Fraley's credibility and reputation by avouching Sergeant McDaniel's accusations against him and calling into question Officer Fraley's version of the events.

### INJURIES TO OFFICER FRALEY

93.     The actions of the Defendants herein have directly caused significant damage to Officer Fraley's personal and professional reputations. He was publicly and openly identified in court and throughout the judicial system and legal community as having been suspended and awaiting termination due to concerns regarding his credibility and candor. The actions of the named Defendants did further damage his reputation, both directly and indirectly, in the law enforcement community, as evidenced by the inability of Officer Fraley to secure alternative employment during the pendency of the investigation.

94.     Several of the named Defendants participated in an active online effort to persistently cast doubt upon and question Officer Fraley's credibility and reputation, and further sought to maliciously disseminate falsehoods and private information about Officer Fraley. Such actions compounded the damage to Officer Fraley's personal reputation and his emotional and mental distress.

95.     Moreover, the Town's refusal to mitigate Officer Fraley's damages through its refusal to reinstate him for a period of nearly 10 months – despite the known and obvious procedural and substantive infirmities associated with his internal affairs investigation— increased the damage to his professional and public reputation by lending credibility to an adverse employment decision that should otherwise have had none. The Town's decision not to reinstate Officer Fraley for 10 months was intentional, grossly negligent, and done with a reckless disregard for the further damage to his professional reputation and the emotional and physical consequences suffered by Officer Fraley and his family.

96.     The very public nature of the damage to the Officer Fraley's reputation and credibility has and will continue to limit his ability to ply his trade and earn a living. His ability to seek employment from law enforcement agencies other than the Town will be forever compromised by the media coverage of the false allegations and by the damage to his public reputation. As such, Officer Fraley's marketability and, therefore, his future income, is impeded and he is unable to seek competitive compensation from third-party agencies commensurate with his experience and capabilities.

97.     In addition to the damage to Officer Fraley's professional and personal reputations, the Defendants' actions were the proximate cause of both emotional and physical injuries to Officer Fraley. The Defendants' collective actions resulted in unnecessary emotional and mental stress and job insecurity. Consequently, Officer Fraley suffered insomnia and recurring nightmares, debilitating depression, and became prone to uncharacteristic bouts of anxiety and anger. In an attempt to cope with the untenable mental and emotional strain, he engaged in behaviors that ultimately induced physical injury. Moreover, the Defendants' conduct and Officer Fraley's ensuing emotional distress caused his physical condition to deteriorate and ultimately led to him having to seek medical intervention for the same. Namely, Officer Fraley experienced significantly elevated blood pressure. Despite his diligent efforts to minimize the physical manifestations of this mental and emotional distress, at present, Officer Fraley continues to receive ongoing medical treatment for his elevated blood pressure, which recently became so severe as to necessitate his taking medical leave from the Department.

98.     The infliction of such significant emotional and mental distress upon Officer Fraley directly resulted in further injury by and through his alienation from friends and family

members for the period of time during which he was suspended from duty, including but not limited to loss of affection with his wife and young children.

SOVEREIGN IMMUNITY

99. The Town is not entitled to the protection of sovereign immunity from liability arising out of its performance of proprietary acts, nor should the doctrine of sovereign immunity shield the municipality from liability for specific Town policies that are otherwise unlawful or implemented for the specific purpose to engage in intentional misconduct. The Town is entitled to immunity only for instances in which their agents and employees were engaged in traditional governmental functions. However, the actions of Mr. Vanegas and his co-conspirators were not tied to the health, safety, and welfare of the citizens of the Town of Purcellville. Indeed, their actions were taken in response to a distinct Town policy to intentionally defame the professional reputation of Officer Fraley, independent of any legitimate Town interest. Nor were the actors engaged in a valid exercise of the Town's political, discretionary, or legislative authority. Instead, the Defendants' behavior, conduct, and decisions were unlawful and made decidedly outside and without legitimate authority. As such, this conduct was not an exercise of any valid governmental function.

100. Immunity is not afforded to employees of the municipality who participated in a policy intending to injure or cause harm to others, and there is no sovereign immunity available to a municipality's independent contractors or subcontractors. Thus, none of the named Defendants are entitled to any measure of immunity for their unlawful, improper, and illegal conduct.

101. Officer Fraley has fully complied with the provisions of Va. Code Ann. § 15.2-209 by providing the Town written notice of the nature of his negligence claims, which included

the time and place where the acts complaint of took place.   **See Notice to Town attached hereto as Exhibit 20.**

## COUNT I – NEGLIGENT HIRING AND RETENTION OF GEORGIA NUCKOLLS (DEFENDANTS TOWN AND VANEGAS)

102.   Officer Fraley incorporates by reference Paragraphs 1 through 101 of the Complaint as though fully set forth herein.

103.   The Town Charter dictates that the Town manager has the exclusive power to appoint and remove all employees and officers of the municipality determined by the Town Council to be necessary for the Town's administration. *See* Purcellville Town Charter § 5-3.   As Interim Town Manager during all times relevant hereto, Mr. Vanegas was vested with the power described above.

104.   Mr. Vanegas, both individually and in his capacity as the Town's representative, through gross negligence and willful indifference to both the established Town guidelines, provisions set forth in the Procurement Act, and the actual occupational demands of his position, hired, appointed, and retained Ms. Nuckolls, a uniquely unqualified and unfit individual to represent the Town's interests related to personnel decisions, placing her in a position from which she posed an unreasonable risk of harm to others.

105.   Mr. Vanegas did so after consultation with and approval from the Four Council Members, each of whom was aware of the role and purpose of Ms. Nuckolls' retention, being part of a larger plan to terminate Chief McAlister from employment using all available remedies, and potentially re-define and/or eliminate the scope of the Purcellville Police Department.

106.   Had Mr. Vanegas and, by extension, the Town, performed a reasonable investigation into Ms. Nuckolls' background, criminal history, or her purported qualifications

28

and certifications, and not knowingly and willfully violated the provisions of the Procurement Act, a more qualified candidate for the vacant position would have been secured. Considering the stated intention behind the hiring of Ms. Nuckolls, it was plainly foreseeable that she would pose a threat of harm to others if she were appointed as the Town's sole human resources contractor charged with conducting an investigation of complaints against Chief McAlister by PPD senior officers.

107. Further, the Town failed and refused to exercise any reasonable care in hiring or appointing Ms. Nuckolls to serve in a position in which—due to the nature of the position and the particular circumstances of her employment with the Town, and in light of her prior felony convictions for fraud, larceny, and forgery, and her blatantly falsified resume—it was readily foreseeable that she posed a threat of injury to others, specifically to other PPD employees.

108. Similarly, the Town acted with gross negligence and willful misconduct in its retention of Ms. Nuckolls as an independent contractor and/or employee after it became apparent that she was unfit and unwilling to responsibly perform the legitimate duties and responsibilities assigned to her pursuant to her terms of contract with the Town.

109. The Town's grossly negligent hiring and retention of Ms. Nuckolls was a direct and proximate cause of the injuries sustained by Officer Fraley as—had the Town exercised reasonable care in hiring or appointing an individual to the position ultimately occupied by Ms. Nuckolls—Officer Fraley would not have been professionally, reputationally, or emotionally and physically harmed by the acts complained of herein.

110. In consideration of the foregoing, the aggravated nature of the conduct entitles the Plaintiff to judgment as to each Defendant in the form of punitive damages.

**WHEREFORE**, KRISTOPHER T. FRALEY moves this Court for judgment as follows:

A.     One million dollars ($1,000,000.00) in compensatory damages, jointly and severally;

B.     Three hundred fifty thousand dollars ($350,000.00) in punitive damages; and

C.     Court costs incurred in filing this action.

## COUNT II – STATUTORY CONSPIRACY
### (ALL DEFENDANTS)

111.   Officer Fraley incorporates by reference Paragraphs 1 through 110 of the Complaint as though fully set forth herein.

112.   Mr. Vanegas, Ms. Nuckolls, Acting Chief Schroeck, Sergeant McDaniel, and Mr. DeBow acted, each in their own capacity and for their own separate and independent benefit, to engage in a concerted, intentional, and malicious effort to damage the professional reputation of Officer Fraley.

113.   The Town, through Mr. Vanegas in his capacity as Interim Town Manager and in furtherance of the directions from the Four Council Members, acted in concert with the above named individuals, to engage in a concerted, intentional, and malicious effort to damage the professional reputation of Officer Fraley, and did in fact ratify the actions of Mr. Vanegas and the other agents of the Town who did participate in the conspiracy.

114.   Mr. DeBow, at all times relevant herein, was an agent and employee of Nova Poly. As a result, Nova Poly is jointly and severally liable for damages to Officer Fraley resulting from the unlawful conspiracy.

115.   All the Defendants engaged in multiple acts as part of a distinct conspiracy to damage the professional reputation of Officer Fraley.

30

116.   The result of the conspiracy as reflected herein amounted to damage to Officer Fraley in the form of (i) mental and emotional distress, which resulted in physical injury; (ii) damage to the personal and professional reputation; and (iii) prospective financial losses, both directly and indirectly, related to the actions of the co-conspirators.

117.   Each of the Defendants is jointly and severally liable for the total damages inflicted upon Officer Fraley as a result of the unlawful conspiracy.

118.   Such total damages are estimated to be and therefore alleged to be $1,000,000.00.

119.   By operation of Va. Code Ann. § 18.2-500, Officer Fraley is entitled to a trebling of his total damages and an award of attorney's fees.

120.   Each of the Defendants are jointly and severally liable for all the full amount of the trebled damages and for all the attorneys' fees incurred in response to the conspiracy.

121.   Additionally, each of the Defendants actions were willful, malicious, and executed with such complete disregard that further damages in the form of punitive damages is warranted.

**WHEREFORE**, KRISTOPHER T. FRALEY moves this Court for judgment as follows:

A.   One million dollars ($1,000,000.00) in compensatory damages, jointly and severally;

B.   Trebled compensatory damages by statute;

C.   Three hundred fifty thousand dollars ($350,000.00) in punitive damages;

D.   Attorney's fees; and

E.   Court costs incurred in filing this action.

## COUNT III – COMMON LAW CONSPIRACY
### (ALL DEFENDANTS)

122.    Officer Fraley realleges paragraphs 1 through 121 as if full set forth herein.

123.    Each and every Defendant worked in concert to improperly remove Officer Fraley as an officer of the PPD through unlawful, improper, and potentially criminal means, including but not limited to publicly defamatory conduct; unlawful usage of a polygraph examination in violation of Va. Code Ann. § 40.1-51.4:4(B); falsifying the results of a polygraph examination; using the results of a polygraph examination for an unlawful purpose; improperly bypassing Town procurement policies; violating the Virginia Public Procurement Act, including but not limited to certain provisions of Article 6 therein; attempting to circumvent the Police Bill of Rights; creating false reports in investigative reports and police investigations; fabricating evidence; falsifying testimony; misrepresenting and distorting facts designed to conceal misconduct; and, otherwise seeking Officers Fraley's termination for reasons contrary to public policy.

124.    These collective actions were taken to further the separate, unique, individual and political goals of the Town, Town agents and officials, including but not limited to those of the Four Council Members, Mr. Vanegas, Acting Chief Schroeck, Sergeant McDaniel, Ms. Nuckolls, and Mr. DeBow; and, that the Defendants did intentionally seek to utilize such improper and illegal actions to publicly discredit Officer Fraley in pursuing those goals, irreparably harming his professional reputation so as to terminate him from employment with PPD.

125.    These actions directly resulted in the aforesaid damages to Officer Fraley, to which each of the above-named Defendants are individually and jointly liable.

126.    Additionally, each of the Defendants actions are willful and malicious, and the Plaintiff is entitled to judgment as to each in the form of punitive damages.

**WHEREFORE**, KRISTOPHER T. FRALEY moves this Court for judgment as follows:

A.    One million dollars ($1,000,000.00) in compensatory damages, jointly and severally;

B.    Three hundred fifty thousand dollars ($350,000.00) in punitive damages; and

C.    Court costs incurred in filing this action.

## COUNT IV – TORTIOUS INTERFERENCE WITH EMPLOYMENT CONTRACT
### (DEFENDANTS VANEGAS, NUCKOLLS, McDANIEL, SCHROECK, DeBOW, and NOVA POLY)

127.    Officer Fraley realleges paragraphs 1 through 126 as if full set forth herein.

128.    Officer Fraley was an employee of the Purcellville Police Department and had a property interest therein and was guaranteed certain rights pursuant to the Police Bill of Rights, Va. Code Ann. §§ 9.1-500, *et seq*.

129.    His relationship with the Town as its employee was maliciously, intentionally, improperly and tortiously interfered with by Mr. Vanegas, Ms. Nuckolls, Acting Chief Schroeck, Sergeant McDaniel, and by Mr. DeBow, both individually and as agent of Nova Poly.

130.    The methods used by the Defendants to interfere with Officer Fraley's employment relationship included, in addition to any those aforementioned, such unlawful and unethical methods as manufacturing and creating false narratives suggesting the dishonesty of Officer Fraley; publicly disseminating falsehoods; attempting to circumvent the mandates of Police Bill of Rights; creating a false polygraph report to support an adverse employment narrative; and, directly interfering with his reputation in the judicial and law enforcement

community.   The damage to Officer Fraley's professional reputation, in addition to having a separate value, also may and will restrict his future earning potential;

131.   The actions of all Defendants involved were grossly negligent, malicious, and conducted with a reckless disregard for the employment rights of the Officer Fraley. Therefore, the Plaintiff is entitled to judgment as to each in the form of punitive damages.

**WHEREFORE**, KRISTOPHER T. FRALEY moves this Court for judgment as follows:

A.   One million dollars ($1,000,000.00) in compensatory damages, jointly and severally;

B.   Three hundred fifty thousand dollars ($350,000.00) in punitive damages; and

C.   Court costs incurred in filing this action.

### COUNT V – VIOLATION OF VIRGINIA CODE § 2.2-3011
### (DEFENDANT TOWN)

132.   Officer Fraley realleges paragraphs 1 through 131 as if full set forth herein.

133.   The Fraud and Abuse Whistle Blower Protection Act, codified at Va. Code Ann. §§ 2.2-3009, *et seq.*, provides, in part, that it is the policy of the Commonwealth that employees of governmental agencies are able to report incidents of wrongdoing or abuse committed by governmental agencies or their independent contractors, and that it is unlawful for a governmental agency to discriminate or retaliate against an employee of said agency who makes a good faith report of or testifies to acts of wrongdoing or abuse committed by the agency or another agency employee.

134.   The discriminatory conduct of the Defendants as hereinabove described was specifically directed at Officer Fraley in retaliation for reporting the abuse, wrongdoing, and misconduct of his superior officer, Sergeant McDaniel, to the Town through Ms. Nuckolls and

34

Mr. Vanegas, and his testimony involving the wrongdoing of two former officers of the Department in previous internal affairs investigations.

135.    The malicious rumors disseminated by senior officers of the PPD, primarily Sergeant McDaniel, were designed and intended to advance and facilitate Chief McAlister's improper termination from the Department and would result in substantial waste and a loss of resource(s) to the Town.    Sergeant McDaniel's efforts in disseminating malicious rumors, especially about a superior officer in his chain of command, were in contravention to the PPD General Orders specifically addressing the code of conduct of the Department's law enforcement officers.

136.    Officer Fraley reported Sergeant McDaniel's abuse and wrongdoing to an appropriate authority in good faith and upon his reasonable belief that the information reported, including the identity of the primary culprit, was true and accurate.

137.    Officer Fraley provided witness testimony into the internal affairs investigations of the wrongdoing of previous members of the Department, Officer Hood and Sergeant Dinkins. The investigations resulted in Officer Hood's termination from the PPD and Sergeant Dinkins' voluntary resignation.    Such testimony related to their wrongdoing and violations of the PPD General Orders was given honestly, in good faith, with no improper purpose, and was true and accurate to the best of his knowledge and communicated in accordance with PPD regulations regarding standards of conduct and officer accountability.

138.    Officer Fraley's report of Sergeant McDaniel's abuse and wrongdoing and as to the his testimony in the internal affairs investigation of the wrongdoing of Officer Hood and Sergeant Dinkins directly resulted in the institution of an unwarranted internal affairs investigation against Officer Fraley and other, related efforts to concoct and manufacture a basis

upon which Officer Fraley could be terminated from the PPD.  These actions were committed in such a manner so as to cause permanent harm to Officer Fraley's integrity, credibility, and professional reputation and cause him severe emotional and mental distress.

139.    In addition to such damages as identified and provided therein, Officer Fraley is entitled to the recovery of his attorney's fees under Va. Code Ann. § 2.2-3011(D).

**WHEREFORE,** KRISTOPHER T. FRALEY moves this Court for judgment as follows:

A.     One million dollars ($1,000,000.00) in compensatory damages, jointly and severally;

B.     Attorney's fees incurred by the Plaintiff; and,

C.     Court costs incurred in filing this action.

## COUNT VI – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (ALL DEFENDANTS)

140.    Officer Fraley incorporates by reference Paragraphs 1 through 139 of the Complaint as though fully set forth herein.

141.    The actions and intentions of Mr. Vanegas, Ms. Nuckolls, Acting Chief Schroeck, and Sergeant McDaniel; of Mr. DeBow, both individually and in his capacity as agent of Nova Poly; and of the Town, as ratified by the Town Council Members and executed as Town policy by Town leadership, including the Interim Town Manager, as hereinabove described, reflect an intentional and willful effort to cause emotional distress to Officer Fraley, or at a minimum, their abject disregard for the consequential emotional distress that naturally occurred as a consequence thereof, and such conduct was outrageous and intolerable and exceeds all bounds of decency.

142. Moreover, the emotional distress suffered by Officer Fraley, including sleeplessness, depression, and his attendant physical injuries, was so severe that a reasonable person could not be expected to endure it.

143. The egregious and outrageous nature of each Defendant's conduct as described above entitles the Plaintiff to judgment as to each in the form of punitive damages.

**WHEREFORE**, KRISTOPHER T. FRALEY moves this Court for judgment as follows:

A.    One million dollars ($1,000,000.00) in compensatory damages, jointly and severally;

B.    Three hundred fifty thousand dollars ($350,000.00) in punitive damages; and

C.    Court costs incurred in filing this action.

## COUNT VII – GROSS NEGLIGENCE
### (DEFENDANTS DeBOW and NovaPoly)

144. Officer Fraley realleges paragraphs 1 through 143 as if full set forth herein.

145. Mr. DeBow is a polygraph examiner practicing in Virginia and is licensed and regulated by the Virginia Department of Professional and Occupational Regulation ("DPOR"). Pursuant to his DPOR licensure, Mr. DeBow is subject to the provisions and regulations set forth in Title 18, Chapter 30 of the Virginia Administrative Code.

146. Mr. DeBow had a professional and fiduciary duty to apply his craft and expertise consistent with regulatory standards as to all examinees.

147. Mr. DeBow's actions, as hereinabove described, in the name of and as a polygraph examiner, were grossly negligent and reflected an intentional, willful disregard of those duties.

148. Mr. DeBow's breach of those duties is a direct and proximate cause of Officer Fraley's injuries sustained to his personal and professional reputation, his legal fees, and diminished ability to seek employment at another law enforcement agency. Mr. DeBow's actions were committed in bad faith, recklessly, willfully and wantonly, and with gross negligence.

149. Mr. DeBow's actions were conducted in the name of his corporation, Nova Poly, which is jointly and severally liable for all such actions.

150. The actions of Mr. DeBow and Nova Poly were grossly negligent, malicious, and conducted with a reckless disregard for the employment rights of the Officer Fraley. Therefore, the Plaintiff is entitled to judgment as to each in the form of punitive damages.

**WHEREFORE**, KRISTOPHER T. FRALEY moves this Court for judgment as follows:

A.    One million dollars ($1,000,000.00) in compensatory damages, jointly and severally;

B.    Three hundred fifty thousand dollars ($350,000.00) in punitive damages; and

C.    Court costs incurred in filing this action.

## COUNT VIII – FALSE IMPRISONMENT
### (ALL DEFENDANTS)

151. Officer Fraley realleges paragraphs 1 through 150 as if full set forth herein.

152. Defendants Nuckolls, McDaniel, and DeBow restrained Officer Fraley's liberty without sufficient legal excuse.

153. Defendants Vanegas and Schroeck conspired with, directed, and/or implicitly approved of, Nuckolls, McDaniel, and DeBow depriving Officer Fraley of his liberty.

154. Defendants Nuckolls, McDaniel, DeBow, Vanegas, and Schroeck acted as agents of Defendant Town of Purcellville, and therefore, the Town is responsible for their actions.

155.   As a direct and proximate result of the actions of the Defendants' actions, Officer Fraley suffered harm.

156.   Defendants actions were willful and intentional, thereby justifying an award of punitive damages.

**WHEREFORE**, KRISTOPHER T. FRALEY moves this Court for judgment as follows:

A.   One million dollars ($1,000,000.00) in compensatory damages, jointly and severally;

B.   Three hundred fifty thousand dollars ($350,000.00) in punitive damages;

C.   Court costs incurred in filing this action.

## COUNT IX – VIOLATION OF 14TH AMENDMENT LIBERTY INTEREST (BODILY INTEGRITY) (ALL DEFENDANTS)

157.   Officer Fraley realleges paragraphs 1 through 156 as if full set forth herein.

158.   The Defendants acted under color of law.

159.   Defendants Nuckolls, McDaniel, and DeBow restrained Officer Fraley's liberty without sufficient legal excuse.

160.   Defendants Vanegas and Schroeck conspired with, directed, and/or implicitly approved of, Nuckolls, McDaniel, and DeBow depriving Officer Fraley of his liberty.

161.   As a direct and proximate result of the actions of the Defendants' actions, Officer Fraley suffered harm.

162.   Defendants actions were willful and intentional, thereby justifying an award of punitive damages.

163.     The actions of Defendants violated Officer Fraley's liberty interest in his bodily integrity under the Fourteenth Amendment to the Constitution of the United States.

164.     Violation of rights secured by the Amendments to the U.S. Constitution are enforced through 42 U.S.C. § 1983.

165.     The Constitutional rights of Officer Fraley at issue in this matter were clearly established, and, therefore, Defendants cannot avail themselves of qualified immunity. \

166.     As Defendant Vanegas was the Acting Town Manager of Defendant Town and Defendant Schroeck was the Acting Police Chief, their decisions and actions constitute the actions, custom, and policy of Defendant Town, thereby subjecting it to liability for invasion of Officer Fraley's bodily integrity.

167.     Defendants actions were willful and intentional, thereby justifying an award of punitive damages.

**WHEREFORE**, KRISTOPHER T. FRALEY moves this Court for judgment as follows:

A.  One million dollars ($1,000,000.00) in compensatory damages, jointly and severally;

B.  Three hundred fifty thousand dollars ($350,000.00) in punitive damages;

C.  His attorney's fees and costs incurred to prosecute this action; and

D.  Court costs incurred in filing this action.


### COUNT X – VIOLATION OF 4TH AMENDMENT, ILLEGAL SEARCH AND SEIZURE (ALL DEFENDANTS)

168.     Officer Fraley realleges paragraphs 1 through 167 as if full set forth herein.

169.     The Defendants acted under color of law.

170.    Defendants Nuckolls, McDaniel, and DeBow searched and seized Officer Fraley's person without sufficient legal excuse.

171.    Defendants Vanegas and Schroeck conspired with, directed, and/or implicitly approved of, Nuckolls, McDaniel, and DeBow search and seizure of Officer Fraley's person without sufficient legal excuse

172.    As a direct and proximate result of the actions of the Defendants' actions, Officer Fraley suffered harm.

173.    Defendants actions were willful and intentional, thereby justifying an award of punitive damages.

174.    The actions of Defendants violated Officer Fraley's right to be free from unreasonable search and seizure under the Fourth Amendment to the Constitution of the United States.

175.    Violation of rights secured by the Amendments to the U.S. Constitution are enforced through 42 U.S.C. § 1983.

176.    At all times material hereto, Defendants violated Officer Fraley's constitutional rights intentionally and/or with reckless indifference, and they knew or should have known that their actions violated federal law, so as to support an award of liquidated and/or punitive damages.

177.    As Defendant Vanegas was the Acting Town Manager of Defendant Town and Defendant Schroeck was the Acting Police Chief, their decisions and actions constitute the actions, custom, and policy of Defendant Town, thereby subjecting it to liability for the illegal search and seizure of Officer Fraley's person.

178. The Constitutional rights of Officer Fraley at issue in this matter were clearly established, and, therefore, Defendants cannot avail themselves of qualified immunity.

**WHEREFORE**, KRISTOPHER T. FRALEY moves this Court for judgment as follows:

A. One million dollars ($1,000,000.00) in compensatory damages, jointly and severally;

B. Three hundred fifty thousand dollars ($350,000.00) in punitive damages;

C. His attorney's fees and costs incurred to prosecute this action; and

D. Court costs incurred in filing this action.

### COUNT XI – VIOLATION OF 14TH AMENDMENT
### LIBERTY INTEREST (REPUTATION)
### (ALL DEFENDANTS)

179. Officer Fraley realleges paragraphs 1 through 178 as if full set forth herein.

180. The Defendants acted under color of law.

181. Defendants conspired to, and in fact did act to harm the reputation, professional and personal, of Officer Fraley, to include harming and conspiring to harm his reputation for veracity.

182. The actions of Defendants violated Officer Fraley's liberty interest in his reputation under the Fourteenth Amendment to the Constitution of the United States.

183. Violation of rights secured by the Amendments to the U.S. Constitution are enforced through 42 U.S.C. § 1983.

184. As a direct and proximate result of the actions of the Defendants herein, Officer Fraley suffered and will continue to suffer pecuniary loss, lost wages, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary loss.

185.   At all times material hereto, Defendants violated Officer Fraley's constitutional rights intentionally and/or with reckless indifference, and they knew or should have known that their actions violated federal law, so as to support an award of liquidated and/or punitive damages.

186.   As Defendant Vanegas was the Acting Town Manager of Defendant Town and Defendant Schroeck was the Acting Police Chief, their decisions and actions constitute the actions, customs, and policies of Defendant Town, thereby subjecting it to liability for violation of Officer Fraley's liberty interest in his reputation.

187.   The constitutional rights of Officer Fraley at issue in this matter were clearly established, and, therefore, Defendants cannot avail themselves of qualified immunity.

**WHEREFORE**, KRISTOPHER T. FRALEY moves this Court for judgment as follows:

A.   One million dollars ($1,000,000.00) in compensatory damages, jointly and severally;

B.   Three hundred fifty thousand dollars ($350,000.00) in punitive damages;

C.   His attorney's fees and costs incurred to prosecute this actions; and

D.   Court costs incurred in filing this action.

## COUNT XII – VIOLATION OF 14TH AMENDMENT
## PROPERTY INTEREST – DENIAL OF DUE PROCESS
### (ALL DEFENDANTS)

188.   Officer Fraley realleges paragraphs 1 through 187 as if full set forth herein.

189.   Officer Fraley had a property interest in his continued employment with the Town of Purcellville.

190.   Officer Fraley was entitled to due process in order to be deprived of this property interest.

191.   The Defendants acted under color of law.

192.   Defendants conspired to, and in fact did act to deny Officer Fraley his property interest in continued employment with the Town, resulting in his proposed termination and his nearly 10-month suspension from his employment: Officer Fraley was suspended from his employment and his termination was proposed without any constitutionally-required due process.

193.   Officer Fraley's proposed termination and suspension came about as a direct and proximate result of the actions of the Defendants.

Violation of rights secured by the Amendments to the U.S. Constitution are enforced through 42 U.S.C. § 1983.

194.   As a direct and proximate result of the actions of the Defendants herein, Officer Fraley suffered and will continue to suffer pecuniary loss, lost wages, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary loss.

195.   At all times material hereto, Defendants violated Officer Fraley's constitutional rights intentionally and/or with reckless indifference, and they knew or should have known that their actions violated federal law, so as to support an award of liquidated and/or punitive damages.

196.   As Defendant Vanegas was the Acting Town Manager of Defendant Town and Defendant Schroeck was the Acting Police Chief, their decisions and actions constitute the actions, customs, and policies of Defendant Town, thereby subjecting it to liability for denying Officer Fraley his  right to due process.

197.   The constitutional rights of Officer Fraley at issue in this matter were clearly established, and, therefore, Defendants cannot avail themselves of qualified immunity.

**WHEREFORE**, KRISTOPHER T. FRALEY moves this Court for judgment as follows:

E.   One million dollars ($1,000,000.00) in compensatory damages, jointly and severally;

F.   Three hundred fifty thousand dollars ($350,000.00) in punitive damages;

G.   His attorney's fees and costs incurred to prosecute this actions; and

H.   Court costs incurred in filing this action.

## COUNT XIII – MUNICIPAL/SUPERVISORY LIABILITY PURSUANT TO 42 U.S.C. § 1983 (VANEGAS, SCHROECK, AND THE TOWN)

198.   Officer Fraley realleges paragraphs 1 through 197 as if full set forth herein.

199.   Defendant Vanegas was the Acting Town Manager for the Town of Purcellville.

200.   Defendant Schroeck was the Acting Chief of Police for the Town of Purcellville.

201.   Vanegas and Schroeck were acting under color of law.

202.   The actions of Vanegas and Schroeck violated the constitutional rights of Officer Fraley in several respects as set forth herein.

203.   Vanegas and Schroeck conspired with and directed others to violate the constitutional rights of Officer Fraley.

204.   Vanegas' and Schroeck's actions constitute a custom and/or policy of the Town of Purcellville.

205.    Accordingly, Vanegas and Schroeck are responsible for the actions of Nuckolls, McDaniel, and DeBow; and the Town is responsible for the actions of Vanegas and Schroeck.

205.    As a direct and proximate result of the actions of the Defendants herein, Officer Fraley suffered and will continue to suffer pecuniary loss, lost wages, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary loss.

206.    At all times material hereto, Defendants violated Officer Fraley's constitutional rights intentionally and/or with reckless indifference, and they knew or should have known that their actions violated federal law, so as to support an award of liquidated and/or punitive damages. The constitutional rights of Officer Fraley at issue in this matter were clearly established, and, therefore, Defendants cannot avail themselves of qualified immunity.

**WHEREFORE**, KRISTOPHER T. FRALEY moves this Court for judgment as follows:

A.  One million dollars ($1,000,000.00) in compensatory damages, jointly and severally;

B.  Three hundred fifty thousand dollars ($350,000.00) in punitive damages;

C.  His attorney's fees and costs incurred to prosecute this actions; and

D.  Court costs incurred in filing this action.

## DEMAND FOR TRIAL BY JURY

207.    Plaintiff demands trial by jury.

RESPECTFULLY SUBMITTED,
KRISTOPHER T. FRALEY

Of counsel

46

Melvin E. Williams (VSB No. 43305)
   *mel@melwilliamslaw.com*
Meghan S. Strickler (VSB No. 88556)
   *meghan@melwilliamslaw.com*
MEL WILLIAMS PLC
1320 Third Street, SW
Roanoke, Virginia 24016-4001
540-266-7800
540-206-3857 *facsimile*
        Counsel for Kristopher T. Fraley

**From:**      Georgia Nuckolls <georgia.nuckolls@gmail.com>
**Sent:**      Thursday, September 21, 2017 8:38 PM
**To:**        'Vanegas, Alex'
**Subject:**   Re: Consultant Assistance

Sounds good.

On Sep 21, 2017, at 8:24 PM, Vanegas, Alex <avanegas@purcellvilleva.gov> wrote:

> Georgia,
>
> Thank you for the quick response. You have a very impressive list of credentials. Can you come in tomorrow morning around 10 am to get started on the investigation. Thank you.
>
> Best regards,
>
> Alex
>
> Sent from my iPhone
>
> Sent from my iPhone
>
> On Sep 21, 2017, at 7:50 PM, Georgia Nuckolls <georgia.nuckolls@gmail.com> wrote:
>
>> *Good Evening Alex,*
>>
>> *No need with the formalities.*
>>
>> *As we've previously discussed my abilities include but are certainly not limited to:*
>>
>> *Certified Senior Professional Human Resources Consultant (SPHR & SPHRi) with 19 years of experience managing human capital projects and strengthening human resources teams. Recognized for successfully transforming underperforming teams; reinventing human resources strategies and resolving issues in critical areas such as internal investigations, performance management, and strategic alignment.*
>>
>> *I've led multiple Internal Investigations for Federal, State, County, and Private employers. My preference is to follow the American Bar Association's Best Practices/Methodologies for Internal Investigations. I've worked side by side with Law Enforcement as they conducted their own, independent, IA Investigations. While I'm not an HR Attorney I am intimately familiar with Federal, State, and*

1



*local Employment Laws/Regulations and General Orders as they pertain to Law Enforcement personnel.*

*My all inclusive hourly rate is $75.*

*Please let me know if you have any further questions, comments, or concerns.*

*Warmest Regards,*
*Georgia Nuckolls, SPHRi, MBA*
*703.517.6627*

On Sep 21, 2017, at 5:24 PM, Vanegas, Alex <avanegas@purcellvilleva.gov> wrote:

Ms. Nuckolls,

I hope all is well. I am in need of your assistance. I want to verify that your consulting expertise can assist the Town in an administrative Investigation.  If this is something that you are available to do, can you please meet with me to discuss the parameters of the investigation. I will need you to complete the enclosed two documents and bring them with you so you can turn them into our Finance Department. I will also need to obtain your hourly rate. I have availability tomorrow between 1 pm-2 pm.  Please let me know if that works with your schedule. If you cannot meet at the aforementioned time, a phone call we be suffice. Thanks.

Best regards,

Alex

**Alex Vanegas, CPM**
*Interim Town Manager*

Town of Purcellville
221 South Nursery Avenue
Purcellville, Virginia 20132
Office: (540) 751-2314
Cell: (540) 454-3632
Email: avanegas@purcellvilleva.gov
Website: www.purcellvilleva.gov

*National Sustainable Community Award Winner*
*Virginia Governor's Environmental Excellence Gold Award*
*Winner*

<image001.jpg> Please consider the environment before printing this email.

2

This e-mail may contain confidential or privileged information. If you are not the intended recipient, please advise by return e-mail and delete immediately without reading or forwarding to others. Thank you.

<Purcellville W-9.pdf>

<Standard Notice of Confidentiality and Participation Requirements in Administrative Investigations.docx>

3



✉ Email

**From:** Georgia Nuckolls
**To:** Vanegas, Alex
**Subject:** Chapman

Message | Commands | Attachments | Journal Entries | Access History | Notes

Alex,

Briefly spoke with Chapman, he's on board with everything. When you have a min to catch-up this afternoon please call me so I can fill you in. I have a lot to cover with you.

Georgia

Sent:9/22/2017 3:35:57 PM



# PROCUREMENT PROCEDURES

**Appendix D**

### TOWN OF PURCELLVILLE
### QUOTATION SHEET <$25,000

The following verbal quotations were received for the below listed item/s:

HR Services including reviewing files for compliance, organizational assessments for local governments and experience in administrative investigations.

| Vendor Name | Contact Name | Telephone No. | Price | Date. | Comments |
|---|---|---|---|---|---|
| Springsted Inc. | John Anzivino | 804-726-9750 | $100 | 9/22/2017 | Former Chief for investigation but not an HR specialist for HR work |
| Starfish Consultant | Margie Hammer | 703-507-1466 | $100 | 9/22/2017 | Limited Investigation experience. |
| SR HR Consultant - ProHR | Georgia Nuckolls | 703-517-6627 | $75 | 9/22/2017 | |
| | | | | | |
| | | | | | |

Date: 9/22/17     Purchasing Agent's Signature _____

**Instructions:** The person calling for quotations should obtain the appropriate number of quotes for the cost range, sign this form, attach to purchase order, hold in Department until invoice comes, obtain appropriate approval on invoice and send copy of form and purchase order with original invoice to the Accounts Payable Office.

Appendix D

17



**CONTRACT AGREEMENT**

**HUMAN RESOURCES & INVESTIGATIVE SERVICES**

THIS AGREEMENT, is made this __25th_____ day of_September_, 2017, by and between the Town of Purcellville, hereinafter called "Town" and Georgia Nuckolls, SPHRi, MBA, ProHR (an individual or a Partnership or a Corporation), hereinafter called "Contractor".

    WITNESSETH: That for and in consideration of the payments and agreements hereinafter mentioned:

1. The Contractor shall commence and complete the work described as the following: Investigation of Complaints of Chief McAlister made by Police Department staff until completion or until the end of the 2017 calendar year whichever comes first. This contract can be extended by Authorization of the Town Manager.

2. The Contractor shall furnish all of the material, supplies, and other services necessary for the completion of the project described herein and provide the Town manager with weekly updates on the status of the project.

3. The Contractor agrees to perform all of the work described in this document following all applicable laws, Personnel Policies and General Order requirements.

4. Contractor shall ensure all services provided pursuant to this Contract are consistent with all applicable law, including without limitation, professional registration and licensing requirements.

5. Employment Discrimination by Contractors Prohibited
    a. During the performance of a contract, the Contractor shall not discriminate against any employee or applicant for employment because of race, religion, color, sex, natural origin, age, disability, or other basis prohibited by state law relating to discrimination in employment, except where there is a bona fide occupational qualification reasonably necessary to the normal operation of the Contractor. The Contractor agrees to post in conspicuous places, available to employees and applicants for employment, notices setting forth the provisions of this nondiscrimination clause.
    b. The Contractor, in all solicitations or advertisements for employees placed by or on behalf of the Contractor, shall state that such Contractor is an equal opportunity employer.
    c. Notices, advertisements and solicitations placed in accordance with federal law, rule or regulation shall be deemed sufficient for the purpose of meeting the requirement of this section.
    d. The Contractor shall include the provisions of the foregoing paragraphs a, b and c in every subcontract or purchase order of over $10,000, so that the provisions will be binding upon each sub-contractor or vendor.

1



6. Drug-free Workplace Maintained - For the purposes of this section, "drug-free workplace" means a site for the performance of work done in connection with a specific contract awarded to a

Contractor in accordance with the Contract Documents, the employees of whom are prohibited from engaging in the unlawful manufacture, sale, distribution, dispensation, or possession or use of any controlled substance or marijuana during the performance of the contract. During the performance of the work described in the Contract Documents, the Contractor shall:

    a. Provide a drug-free workplace for the Contractor's employees;
    b. Post in conspicuous places, available to employees and applicants for employment, a statement notifying employees that the unlawful manufacture, sale, distribution, dispensation, possession, or use of a controlled substance or marijuana is prohibited in the Contractor's workplace and specifying the actions that will be taken against employees for violations of such prohibition;
    c. State in all solicitations or advertisements for employees placed by or on behalf of the Contractor that the Contractor maintains a drug-free workplace; and
    d. Include the provisions of the foregoing clauses in every subcontract or purchase order of over $10,000, so that the provisions will be binding upon each sub-contractor or vendor.

8. Compliance with Immigration Law - The Contractor does not, and shall not during the performance of the Contract and any contracts entered into thereunder, knowingly employ an unauthorized alien as defined in the federal Immigration Reform and Control Act of 1986.

9. Safety.- All Contractors and sub-contractors performing services for the Town shall comply with OSHA standards and accepted safety rules and regulations.

10. The Owner shall pay to the Contractor in the manner and at such times as set forth in the General Conditions such amounts as required. Progress payments shall be made within 30 days of receipt of an approved invoice.

11. Invoicing and Payment -

    a. Invoices shall be based upon actual services rendered and actual hours of performance not to exceed $75 per hour. Payment terms will be Net 30 days upon receipt of an approved invoice or completion of work, whichever is later. Should an invoice have items thereon which are questioned, payment will be withheld pending verification of the amount claimed and the validity of the claim. The Contractor shall provide complete cooperation during any such investigation. All invoices shall be forwarded to the following address:

Town of Purcellville
221 South Nursery Avenue

Purcellville, Virginia 20132
Attention: Interim Town Manager

The Contractor shall submit invoices, either upon completion of the project or on a monthly basis. Invoices must include a detailed breakdown of all charges for that monthly period and the Town Purchase Order Number.

b. Payments shall be made for each Task Order upon receipt by the Town of proper billing, in accordance with the schedule shown in the Task Order. Billing shall be based on the hours agreed upon for performing the services multiplied by the fixed billable hourly rate as stipulated in Fee/rate schedule plus non-salary direct costs. In the event the hourly rates in Fee/rate schedule are misrepresented by the Contractor, the Town reserves the right to adjust the compensation paid to the Contractor to reflect the difference.

12. Indemnification and Hold Harmless - The Contractor shall indemnify, defend, and hold harmless the Town including its Council members, officers, agents, employees, volunteers, contractors and subcontractors from any claims, damages, suits, actions, liabilities, and costs of any kind or nature, whether at law or in equity, arising or resulting from, or in any way connected with, the actions or inaction of any of the following: the Contractor, any sub-contractor of the Contractor, or any employee, agent, or assign of the Contractor or sub-contractor of the Contractor. The Town shall have the right to approve or reject any attorney selected to defend the Town. Said indemnification and defense shall include the cost, through all available appeals, of all attorneys' fees, all investigations, and all other expenses reasonably necessary for litigation and final appeals on the matter.

13. Insurance. Prior to the Town executing this Contract with a Contractor, the Contractor shall submit to the Town an endorsement showing the Town, its officers, employees and agents as additional insureds and any other certificates.

14. Termination for Convenience -
   a. The parties agree that the Town may terminate this Contract, any work hereunder, any Task Order issued hereunder, or any portion of any Task Order issued hereunder, from time to time, either in whole or in part, whenever the Town determines that such termination is in the best interest of the Town.

   b. Termination, in whole or in part, shall be effected by delivery of a Notice of Termination signed by the Town Manager or his designee, mailed, faxed, e-mailed, or delivered to the Contractor, and specifically setting forth the effective date of termination.
   c. Upon receipt of such Notice, the Contractor shall:

      (i) cease any further deliveries or work due under this Contract, on the date, and to the extent, specified in the Notice;

3

(ii) place no further orders with any subcontractors except as may be necessary to perform that portion of this Contract not subject to the Notice;

(iii) settle all outstanding liabilities and claims that may arise out of such termination, with the ratification of the Town Manager or his designee; and

(iv) use its best efforts to mitigate any damages that may be sustained by Contractor as a consequence of termination under this clause.

d. After complying with the provisions of subparagraph "c," above, the Contractor shall submit a termination claim, in no event later than six months after the effective date of its termination, unless one or more extensions of three months each are granted by the Town Manager.

e. The Town Manager, or his designee, shall pay from the using department's budget reasonable costs of termination, including a reasonable amount for profit on supplies or services delivered or completed. In no event shall this amount be greater than the original price of Task Orders issued, reduced by any payments made prior to Notice of Termination, and further reduced by the price of the supplies not delivered, or the services not provided. This Contract shall be amended accordingly, and the Contractor shall be paid the agreed amount.

f. In the event that the parties cannot agree on the whole amount to be paid to the Contractor by reason of termination under this clause, the Town Manager shall pay to the Contractor the amounts determined as follows, without duplicating any amounts which may have already been paid under the preceding paragraph of this clause:

(i) with respect to all Contract performance prior to the effective date of Notice of Termination, the total of:

(A) cost of work performed or supplies delivered;

(B) a sum as profit on (A) determined by the Town Manager to be fair and reasonable.

(ii) the total sum to be paid under (i) above shall not exceed the price of task orders issued, as reduced by the amount of payments otherwise made, and as further reduced by the price of work or supplies not terminated.

g. In the event that the Contractor is not satisfied with any payments determined to be due under this clause, the Contractor may appeal any claim to the Town Council in accordance with the terms of this Contract governing Disputes.

h. Contractor shall include similar termination-for-convenience provisions in any subcontract and shall specifically include a requirement that subcontractors make all reasonable efforts to mitigate damages that may be suffered by a termination for convenience. Failure to include such provisions shall bar the Contractor from any recovery from the Town whatsoever of loss or damage sustained by a subcontractor as a consequence of termination for convenience.

i. The Town is not obligated to issue task orders under this Contract for any minimum amount of services, and the Town's failure to issue task orders, or to issue task orders for any minimum amount, shall not be deemed to be a termination for convenience of this Contract or a breach by the Town of this Contract.

15. Termination for Cause – Either party may terminate this Contract or any task order issued hereunder for the breach or default by the other party or its agents or employees with respect to any term or condition contained herein or in a task order by (a) providing written notice and a period of fourteen days to cure the default or breach; and (b) if the default or breach remains uncured for fourteen days after written notice, by issuing a second written notice terminating the Contract or task order. Notwithstanding the foregoing, Contractor's right to terminate this Contract for default or breach is limited to circumstances when the breach or default would be deemed a material breach of this Contract. If the Town terminates this Contract or any task order for default or breach and it is later determined that the termination was erroneous, then the termination shall be deemed to have been for convenience pursuant to Section 14 of this Contract, and Contractor's damages recoverable from the Town shall be limited to those amounts recoverable from the Town under Section 14 for a termination for convenience.

16. Assignment. Neither this Contract, nor any part hereof, may be assigned by the Contractor to any other party without the express written permission of the Town.

17. Waiver of Consequential Damages. Contractor hereby waives any claim of consequential damages against the Town.

18.. This Contract shall be binding upon all parties hereto and their respective heirs, executors, administrators, successors, and assigns.

Signatures on next page

5

IN WITNESS WHEREOF, the parties hereto have executed, or caused to be executed by their duly authorized officials, this Agreement in two copies, each of which shall be deemed an original on the date first above written.

OWNER:

Notary Public Commission Expires

Town of Purcellville

By _____

Name: Alex Vanegas, SPM

Title   Town Manager

CONTRACTOR:

SR HR Consultant Pro HR

_____

Notary Public Commission Expires

BY _____

Name: Georgia Nuckolls, SPHRi, MBA

Title   Sole Proprietor

I, the undersigned, on behalf of the Town of Purcellville, hereby verify that the contents of the above Owner-Contractor Agreement has been reviewed and approved.

_____

Contents Approved By

6

# Commonwealth of Virginia



## State Corporation Commission

### CERTIFICATE OF FACT

*I Certify the Following from the Records of the Commission:*

The existence of PROHR, INC., a Virginia corporation, was automatically terminated as of January 31, 2005 for its failure to pay the annual registration fee as required by law.

Nothing more is hereby certified.



*Signed and Sealed at Richmond on this Date:*
*March 1, 2018*

*Joel H. Peck*
*Joel H. Peck, Clerk of the Commission*

CIS0357



EXHIBIT
5

# PUBLIC REPORT
# OF AUDIT AND INVESTIGATION
# (PHASE 1)

**Prepared by:**

Yoora Pak, Esq.
Jason Waters, Esq.
Matthew Lee, Esq.
Wilson Elser

Chief Timothy Longo, Sr. (Ret.)
Assistant Professor
The University of Virginia
School of Continuing and Professional Studies

April 10, 2018



EXHIBIT
6

1

FOR PUBLIC RELEASE

## I.   SUMMARY OF AUDIT AND INVESTIGATION

This team was engaged by the Town of Purcellville ("Town") to audit and evaluate the investigation and findings of independent consultant/contractor Georgia Nuckolls. Ms. Nuckolls, who represented herself as a certified Human Resources professional, was hired by Interim Town Manager Alex Vanegas on or about September 22, 2017, to investigate a number of complaints made against Chief of Police Cynthia McAlister. Based upon Ms. Nuckolls' findings as set forth in a Confidential Investigation Report ("the Nuckolls Report" or "the Report"),[1] the Town Council announced a vote of "no confidence" in Chief McAlister on November 1, 2017, and the Interim Town Manager (Mr. Vanegas) terminated her on November 2, 2017.

Upon engagement, it was decided that our audit and investigation would be completed in two phases. The first phase would audit and evaluate the Report's investigative methodology and findings, and determine whether the Nuckolls Report is reliable.[2] Based upon our findings for the first phase report, if warranted, we would continue with the second phase. The second phase would focus on investigating and evaluating the merits of the allegations against the Police Chief.

This initial public report summarizes our findings with respect to the first phase of our audit and investigation. As part of the first phase, we reviewed the Nuckolls Report and its attachments, and conducted multiple interviews[3] and collected numerous documents and extensive information. Based upon our assessment of all of this information, we prepared a confidential and privileged 71-page report that detailed the results of the first phase of our independent audit and investigation.[4] This public report summarizes our findings from the confidential and privileged report.

As explained in further detail below, we believe that there are serious deficiencies in the investigative methods and processes that undermine the reliability and accuracy of the Report. In addition, based upon a preliminary review of the purported evidence relied upon by Ms. Nuckolls, we believe that the Report's findings and conclusions are not supported by the evidence. However, based upon the limited record of the prior investigation, we do not purport to, and cannot, fully address the merits of each specific complaint against Chief McAlister. In

[1] The complaints made against Chief McAlister and Ms. Nuckolls' Confidential Investigative Report involved personnel issues and other matters compiled exclusively for use in closed meetings lawfully held pursuant to Va. Code § 2.2-3711, which are exempt from disclosure under Va. Code §§ 2.2-3705.1(1) and (5). Accordingly, Ms. Nuckolls' Report has not been, and will not be, released.
[2] The first phase also included a separate and independent investigation into the allegations of sexual harassment by Mr. Vanegas as well as other complaints against Town Attorney Sally Hankins and Human Resources Manager Sharon Rauch. Wilson Elser has completed that investigation and prepared a confidential and privileged report on these personnel matters detailing its findings and outlining its recommendations. Our confidential and privileged report on the personnel matters will not be release and is exempt from disclosure under Va. Code §§ 2.2-3705.1(1), (2), (3) and (5).
[3] We have asked Ms. Nuckolls to meet with us on at least two occasions. In response, she has refused to communicate with us directly, and, instead, has chosen to communicate with us through emails to Interim Town Manager John Anzivino. She has advised in those emails that she will not meet with us.
[4] Our confidential and privileged report has not been released and is exempt from disclosure under Va. Code §§ 2.2-3705.1(1), (2), (3) and (5).

782858v.1

2

FOR PUBLIC RELEASE

addition, we do not express any opinion as to Chief McAlister's performance or leadership of the Purcellville Police Department. Based upon our initial assessment, we believe that further investigation is warranted and necessary to fully evaluate the merits of the complaints against Chief McAlister

Accordingly, as a result of the first phase of our audit and investigation,[5] we do not believe that the Town can rely upon the Report to take any personnel action against Chief McAlister. Thus, we believe that the Report should be disregarded in its entirety.

## II.   BACKGROUND

On July 27, 2017, a number of employees from the Purcellville Police Department (PPD) [hereinafter "Complainants"] approached then-Interim Town Manager Alex Vanegas to voice various complaints about Chief McAlister. As a result of their complaints, the Town conducted an internal investigation. Contrary to established Town procedure, Mr. Vanegas, citing a "rapport" with the Complainants, conducted the internal investigation himself. As a result of his internal investigation, Mr. Vanegas placed the Chief on paid administrative leave on August 28, 2017.

After obtaining three purported bids, on September 22, 2017, Mr. Vanegas hired "Georgia Nuckolls, SPHR(i), MBA" from ProHR, Inc. to conduct an independent investigation into the complaints about the Police Chief. Mr. Vanegas claimed that he selected Ms. Nuckolls because she offered the lowest bid and due to her experience with internal investigations. Mr. Vanegas explained his selection to the *Loudoun Tribune*:

> Vanegas stated that he selected Nuckolls not just because of the lower hourly fee but because of her education and background directly related to HR investigative work. As well, the fact that she is married to a very well-respected detective in Herndon and felt her background overall would result in a fair fact-finding ability and detailed set of conclusions regardless of whether they were for or against McAlister.
>
> It is difficult for anyone to overlook her [Nuckoll's] education and experience," said Vanegas.

*See* https://www.loudountribune.com/smear-tactics-purcellville-beginning-backfire/.

## III.   ATTEMPTS TO VERIFY MS. NUCKOLLS' CREDENTIALS

Ms. Nuckolls represents herself as "Georgia Nuckolls, SPHR(i), MBA." As she explained to the *Loudoun Tribune*:

> "I have a BA in English Literature from George Mason University, MBA from Loyola Marymount University with a concentration in

---

[5] Should additional information become available, we will supplement or modify our findings as required by such evidence.

FOR PUBLIC RELEASE

HR Management. I hold a Senior Professional of HR Certification with an International designation from the Society for Human Resources Management, have over 19 years of HR consultative experience, including very detailed HR investigative projects and assignments in a wide range of industries from fortune companies (sic) to municipalities," stated Nuckolls.

*See* https://www.loudountribune.com/smear-tactics-purcellville-beginning-backfire/.

As part of our investigation, we attempted to verify Ms. Nuckolls' credentials. We did not find a copy of Ms. Nuckolls' resume or other document summarizing her professional and educational qualifications and credentials in the Town's records. As a result, we attempted to verify Ms. Nuckolls' credentials through online resources. As explained below, we were unable to verify her credentials.

Ms. Nuckolls stated that she held the "Senior Professional of HR Certification with an International designation from the Society for Human Resources Management." She does not indicate the year in which she received this certification.

According to the Society for Human Resources Management ("SHRM"), the "SPHR(i)" designation[6] is a trademark of the HR Certification Institute ("HRCI") and is not a SHRM certification. *See* https://www.hrci.org/our-programs/our-certifications/SPHRi; https://www.shrm.org/certification/faqs/pages/faqs-other-questions.aspx.

Both entities provide online directories of their certified professionals. *See* https://recert.hrci.org/public/membersearch/certificants; *https://portal.shrm.org/public/directory.aspx*. We searched the following known names for Ms. Nuckolls:

- G Nuckolls
- Georgia Nuckolls
- G Nuckoll
- Georgia Nuckoll
- G Damalas
- Georgia Damalas
- G Herron
- Georgia Herron

Neither the HRCI nor SHRM online directories returned any results for these names.

---

[6] "SPHR(i)" stands for "Senior Professional in Human Resources – International," and requires a combination of years of professional experience and education (i.e., 4 years of experience and a master's degree). *See* https://www.hrci.org/our-programs/our-certifications/SPHRi. Assuming the candidate satisfies one of the conditions for education and experience, the candidate must then pass a certification examination. *Id.*

FOR PUBLIC RELEASE

To ensure the accuracy of the online inquiries and because certified professional have an ability to "opt out" from the directory, we also made an inquiry of HRCI by email. HRCI will not release any information, however, without an authorization from Ms. Nuckolls.

Ms. Nuckolls also claims to have "over 19 years of HR consultative experience." Mr. Vanegas claimed that he reviewed Ms. Nuckolls' experience and qualifications on her LinkedIn page. We found the following account on LinkedIn:



See https://www.linkedin.com/in/georgia-n-3101a1144/. This image is the entirety of her publicly-available profile as of the date of our search. It does not contain any information regarding Ms. Nuckolls' experience or qualifications.

Mr. Vanegas then directed us to another LinkedIn page, which he claimed was the one that he reviewed. That account contained the following publicly-available information:



FOR PUBLIC RELEASE

Human Resources' Articles

**Labor Relations**
**HR Associates**
**Handbooks**
**Recruiters**
HR Specialists

# Human resources

Ben   401K

Regular General

H1B   HR Managers   Open Enrollment

**How can an HR Consultant benefit my business?**
Human Resources C. on LinkedIn
December 7 2016

See all articles

Featured Skills & Endorsements

Recruiting · 99+          Endorsed by Craig Perry and 1 other who is highly skilled at this

Talent Acquisition · 98   Endorsed by Craig Perry and 1 other who is highly skilled at this

Human Resources · 73     Endorsed by Craig Perry and 1 other who is highly skilled at this

Show more ⌄

6

FOR PUBLIC RELEASE

(20) Human Resources C. | LinkedIn                                                              2/10/19; 8:06 AM

| | | | |
|---|---|---|---|
| Management  66 | Employee Relatio...  63 | Professional Serv... · 51 | |
| Technical Recruit...  60 | CRM  19 | Managed Services:  48 | **Technical Recruiting** |
| Training  35 | Organizational D...  34 | Vendor Managem...  29 | Viewers: 68,208 |
| Consulting  75 | Project Managem...  23 | Hiring  17 | **Hiring a Recruiting Firm** |
| Temporary Place...  16 | Employee Benefits  15 | Program Manage...  14 | Viewers: 8,847 |
| Benefits Adminis...  13 | HR Consulting  13 | Project Planning  12 | See more course |
| Personnel Manag...  11 | Talent Managem...  · 11 | Internet Recruiting  11 | |
| Strategy  10 | IT Recruitment  9 | SDLC  8 | Promoted |
| Conflict Resolution  7 | Employment Law  8 | Team Management  5 |  |
| Benefits Negotiat...  6 | Staff Augmentati...  6 | Resource Manag...  5 | Headhunters are searching |
| Executive Manag...  5 | Sourcing  5 | Onboarding  5 | for executives with your skills. Join the network and be found! |
| Interviews  5 | Staffing Services  5 | Contract Recruit...  4 | Learn more |
| Industrial Relations  1 | Applicant Trackin...  3 | Budgets  3 | |
| Policy  3 | Screening Resum...  1 | Management Co...  2 | Need Medical Records? |
| Screening  2 | Executive Search  2 | College Recruiting  2 | Are medical records holding up your case? Try Record Grabber today! |
| Employee/Labor ...  1 | Employee Couns...  1 | | Learn more |

Show less ∧

## Recommendations

Received: (11)     Given (0)

Georgia goes out of her way to ensure success - for her company for her clients, and for her recruits. Many times she became the trusted advisor in placement opportunities, managing the entire process from introduction to successful placement. She always kept everyone informed of progress, and worked through obstacles in the most professional and committed of ways.

**Eric Linzweiler**
Regional Director, Western
Region at INIT Innovation's
in Transporation, Inc.
August 19, 2014; Eric worked
with Human Peas... in
different groups

Georgia would be a welcome member of any team, and I was very happy to have had a chance to work with her.

782858v.1

7

FOR PUBLIC RELEASE

[20] Human Resources C. | Linkedin                                    2/10/18, 8:06 AM



**John Painter**
Sr. Consultant Cloud & Managed Services at Presidio
August 12, 2014, John worked with Human Resources in different groups

I would like to offer a professional recommendation for Georgia Nuckolls based on the tremendous work effort and value she delivered through our interactions while working together at Logicalis. Georgia is the consummate professional with the type of high-energy, determined approach needed to be successful in her areas of expertise.

Through her proactive and thorough efforts, Georgia delivered highly qualified candidates for our review in various search engagements and was always working to ensure our pipeline was filled with only those candidates that had a high probability of success.

Evidence of Georgia's years of experience, knowledge of our industry, and solid methodology was successfully delivered with each and every candidate brought forth. I can easily offer up my recommendation for any organization seeking to achieve positive results!

John Painter
Regional Sales Leader
Logicalis

**David Cartmel**
Engagement Manager (Chair, PMP, CISSP, CISO) at Master Consulting
September 6, 2013, David was senior to Human Resources but didn't manage directly

Georgia is an energetic and creative recruiter. She is able to pull from a wide range of talent and find some of the most capable individuals available. Her abilities saved enormous amounts of time vetting candidates while delivering the highest percentage of talent. She was a pleasure to work with and never hesitated to take on even the most difficult of tasks. Highly recommended!



**Philip Magnuszewski**
Digital Strategist | Connector of Dots
August 21, 2013, Philip worked with Human Resources in different groups

I had the pleasure of working with Georgia at Logicalis. She is a consummate professional and expert in the area of talent acquisition and recruitment. She was tenacious in finding the right talent for our engagements and focused on making sure that the client's requirements and expectations were exceeded. Georgia was an invaluable member of my internal team.

**Anthony Virgillo**
Seeking Career Search Of a Senior/Executive Position in Business | Program Development User Culture / Prospect Management
December 17, 2012, Anthony worked with Human Resources but at different companies

Outstanding professional with in-depth background and technical expertise in all areas related to HR. Comprehensive knowledge of Federal, State and local regulations regarding all aspects of HR from recruitment and hiring to HR policies to retirement and termination.

**Joe Miera**
Technical Recruiter at Barzoch International
August 28, 2009, Joe was senior to Human Resources but didn't manage directly

Georgia is a traffic individual, grounded in sound judgment, professionalism and enthusiasm for life and her profession. Her academic and professional achievements in Human Resource Management, Marketing and Recruiting serve as a strong foundation for her success in any area in which she chooses to pursue. She is a master of multi-tasking and possesses an amazing ability to balance work and life. Her bubbly personality and gift to communicate make her joy to have as a friend and a co-worker.

https://www.linkedin.com/in/pront17/                                    Page 3 of 5

FOR PUBLIC RELEASE

(20) Human Resources C, I LinkedIn                                                                 2/10/18, 8:06 AM

**Viral Shah**
Assistant Vice President
Consulting Sales at
Deepaark Inc
June 18, 2009 "Viral
Resources was a client of Viral's

Its been over a year and a half that I am working with Georgia on her business requirements; and we have closed sizable deals. It's such a pleasure working with her cause she knows what she wants which bring lot of efficiency in to her work along with in those working for her. I strongly recommend her work for anything related to staffing/HR domain.

 **J Susan Ahmad**
VP Services at Edge
Solutions
May 15 2009 , Susan worked with Human Resources in different groups

Georgia is uniquely expert in her ability to locate ideal candidates and place supplemental staffing with customers. Adding her responsiveness and ability to gain customers' confidence results in repeat engagements and the highest degree of customer satisfaction. Georgia is definitely someone you want playing on your team.

**Michael Seymour**
SENIOR IT EXECUTIVE |
STRATEGIC PLANNING |
BUSINESS AND
TECHNOLOGY
TRANSFORMATION
|PERFORMANCE
IMPROVEMENT
May 14, 2009 Michael was a client of Human Resources"

Georgia has worked with us for over a year assisting us with both contract and full time employment searches. She is high-energy and detail oriented. Her placements have always been professional and her price has always been very reasonable.

 **Josh Ornstein**
Vice President at
Technology Operations at
VEREIT Services
March 17 2009 Josh worked with Human Resources in different groups

Georgia is the most talented, resourceful and driven recruiter I have even had the pleasure to work with. She thinks out of the box, quickly gains an in depth understanding of what is needed by asking intelligent and insightful questions and listening to the answers. She is responsive, is a pleasure ot work with, and has a strong work ethic as well as demonstrated integrity reagrding the quality of her product. I wish we had 20 of her.

 **Tim Warder**
Accomplished Digital
Product Operations and
Marketing Executive
October 4, 2007 Tim was better in Human Resources but didn't manage directly

Georgia is an exceptional professional and I greatly valued the time we shared as part of Prodcom's executive leadership team. At a time when the company was in great need, she brought vision and leadership to the executive human resources role which helped the company accomplish a culture change and grow into a leading interactive marketing services firm. She restored professionalism and honor to a key functional area that had previously languished in a difficult business turn around environment. I highly recommend Georgia.

Show less ∧

**Interests**

FOR PUBLIC RELEASE



https://www.linkedin.com/in/prohr17/. This LinkedIn page also does not contain Ms. Nuckolls' educational background or professional experience. Instead, a reader must derive her experience from the recommendations, which appears to be primarily focused on recruiting, not internal investigations. Indeed, none of the purported recommendations refers to any experience with a municipality or a police department.

Next, we attempted to verify the existence of Ms. Nuckolls' company, ProHR, Inc. She listed ProHR, Inc. on her IRS Form W9, which she submitted to the Town for purposes of payment. According to the online Business Entity Search database on the Commonwealth of Virginia State Corporation Commission ("SCC") website, ProHR, Inc. has been "purged" from the SCC's records:



https://sccefile.scc.virginia.gov/Find/Business?SearchTerm=ProHR%2C+Inc.&SearchPattern=K&as_fid=ba16649e9e99968cc873c2094c423b5012b9f32d. We received written verification from the SCC:

FOR PUBLIC RELEASE

# Commonwealth of Virginia



## State Corporation Commission

### CERTIFICATE OF FACT

*I Certify the Following from the Records of the Commission:*

The existence of PROHR, INC., a Virginia corporation, was automatically terminated as of January 31, 2005 for-its failure to pay the annual registration fee as-required by law.

Nothing more is hereby certified



Ci80357

*Signed and Sealed at Richmond on this Date:*
*March 1, 2018*

*Joel H. Peck*
*Joel H. Peck, Clerk of the Commission*

As explained by the SCC, if a corporation has been "purged," it means that "its existence or registration has been canceled, revoked, terminated or withdrawn for a period of more than 5 years and, under Virginia law, the entity is <u>not</u> eligible for reinstatement or restoration." http://www.scc.virginia.gov/clk/ReinReq.aspx (emphasis in original).

FOR PUBLIC RELEASE

Finally, Mr. Vanegas claimed that he received a copy of a business license issued by Loudoun County for ProHR, Inc. He could not, however, provide us with a copy of this business license, and we could not locate one in Mr. Vanegas' files or office during our investigation.

We searched Loudoun County's list of business licenses for ProHR, Inc. by using a very general search term ("pro") and it did not come up as a registered business. *See* *http://www.loudounonline.com/search/search.cfm?search=1.* In addition, ProHR, Inc. is not listed on the Loudoun County Active Business Accounts list as of November 3, 2017. *See* *https://www.loudoun.gov/DocumentCenter/View/129372.*

At this time, we are unable to verify whether Ms. Nuckolls earned a BA in English Literature from the George Mason University or an MBA from Loyola Marymount University, which is located in Los Angeles, CA.

In summary, we were unable to verify Ms. Nuckolls' claim of having "over 19 years of HR consultative experience." We are also unable to verify that she has received the SPHR(i) certification as she has claimed. We have confirmed that her company, ProHR, Inc., is not a viable legal entity in the Commonwealth of Virginia and is not registered as an "Active Business Account" as of November 3, 2017, in Loudoun County.

## IV.   RELIABILITY OF THE INVESTIGATIVE REPORT

The Town of Purcellville contracted the services of Ms. Nuckolls to conduct an independent investigation into allegations of misconduct on the part of the Town's chief law enforcement officer. Ms. Nuckolls' investigation results were outlined in a lengthy written report, which included numerous attachments ("the Report"). The Town then relied upon this Report to take personnel action with respect to Chief McAlister.

We have been asked to review the Report to evaluate whether it can be reasonably relied upon to support the Town's actions against the Chief. To reiterate, we are not at this time fully evaluating the merits of the underlying complaints against Chief McAlister. For purposes of this initial report, we focus solely on whether Ms. Nuckolls' methodology, analysis, and findings were reliable, consistent, and supported by the record. Based upon our review and audit, we believe that there are several deficiencies undermining the reliability and accuracy of the investigation and its conclusions.

### A.   Ms. Nuckolls' Credibility Determinations

The first half of the Report focuses on a summary of the "credibility determinations" made during the investigation.[7] In general, we found Ms. Nuckolls' credibility determinations[8] to be conclusory and lacking adequate foundational support.[9]

---

[7] We note that this section of the Report does not contain a summary of all of the witnesses who were interviewed.
[8] The Report stated that some individuals were "credible" while there was "no reason to question" the credibility of others (which begs the question as to whether she believed that the individual was credible). Ms. Nuckolls does not explain the difference, if any, in this terminology.
[9] The credibility of a witness rests upon a number of factors. A jury will be instructed to consider "the appearance and manner of the witnesses on the stand, their intelligence, their opportunity for knowing the truth and for having

FOR PUBLIC RELEASE

## 1. The credibility determinations are conclusory and lack factual support.

The Report provided broad and general descriptions about the quality of the responses to the investigator's questions. For example, the Report stated that one witness provided "long and detailed answers" and found that this witness "had a very clear recollection of events." The Report also stated that some of the witnesses provided "very thoughtful and detailed" or "clear" responses, and that they appeared "straightforward" and "to the point." The Report further noted that one witness "appeared to choose his words carefully to ensure his description of events were (sic) accurate and 'true' to his recollection not to 'others.'" Further, the Report found another witness to be "well rehearsed" and concluded that "some of his allegations were unfounded or embellished."

However, in making these observations, the Report did not provide any factual references or supporting evidence. The Report does not contain a summary of the information provided by any of these witnesses, and does not provide any information as to the factual basis of the credibility finding. Thus, we have no way to evaluate the information upon which the Report relied to make the credibility determinations. Accordingly, we are unable to determine if her observations were accurate and reliable.

## 2. The credibility determinations were based upon irrelevant factors.

We believe that the Report relied upon factors that are irrelevant with respect to one's credibility. For example, the Report stated that witnesses were credible because of their length of employment as a Town employee; their record of service (*i.e.*, stating that one's credibility was enhanced because that individual had an "untarnished" record and was "held in very high regard"); a review of the witnesses' personnel files (such as performance evaluation ratings or employment history); marital status and family situation (concluding that a witness was more credible because that witness "risked" his or her career by making a complaint); whether the witness was a homeowner in Purcellville; an individual's job responsibilities; their reputation; or the rating on their performance evaluation. Conversely, the Report questioned the credibility of one witness based, apparently, upon the belief that the witness was somehow interfering with the investigation without providing any foundation for this conclusion.

In any event, a consideration of these factors, even if relevant, was not reliable because the Report failed to provide sufficient details to evaluate the weight given to those considerations. For example, to the extent Ms. Nuckolls relied upon an individual's reputation as an indication of credibility, she does not provide the foundation for the reputation or the sources verified. Without such information, one cannot determine if the "regard" was genuine, objective, and unbiased.

In one instance, Ms. Nuckolls concluded that a witness' willingness to take a polygraph test was a positive indication of credibility. The Virginia Supreme Court, however, has steadfastly held that polygraph tests are unreliable:

---

observed the things about which they testified, their interest in the outcome of the case, their bias, and, if any have been shown, their prior inconsistent statements, or whether they have knowingly testified untruthfully as to any material fact in the case." *Virginia Model Jury Instruction No. 2.020*: Credibility of Witnesses.

FOR PUBLIC RELEASE

> [P]olygraph examinations are so thoroughly unreliable as to be of no proper
> evidentiary use whether they favor the accused, implicate the accused, or are
> agreed to by both parties.    The point of these cases is that the lie-detector or
> polygraph has an aura of authority while being wholly unreliable. ... In *Robinson*
> *[v. Commonwealth*, 231 Va. 142 (1986)], we expressed our continuing concern
> over the use of polygraph exams in any court proceeding in Virginia. ... We
> continue to adhere to the views expressed in that long line of cases. *See Billips v.*
> *Commonwealth*, 274 Va. 805, 808-09, 652 S.E.2d 99, 101 (2007) ("lie-detector"·
> tests are so unreliable that the considerations requiring their exclusion have
> ripened into rules of law) (citing *Spencer v. Commonwealth*, 240 Va. 78, 97, 393
> S.E.2d 609, 621 (1990)).

*Turner v. Commonwealth*, 278 Va. 739, 742-743 (2009) (quotations and some citations omitted).
In addition, polygraph test results are inadmissible in any proceeding. *See* Va. Code § 8.01-
418.2.

### 3.   The reliance on prior Internal Affairs ("IA") files appeared inconsistent.

The Report also refers to an individual's history of IA charges to assess credibility.  However,
the findings appear to be based upon an incomplete review of an individual's record.  In addition,
this "criterion" is not consistently applied or reviewed as to all witnesses.  For example, one
witness is described as having an "untarnished" record when that witness had previous IA
charges.  The Report mischaracterizes the record of another witness by stating that the only IA
charges brought against this witness were under Chief McAlister when the record shows that
there were a number of other IA charges against this witness prior to Chief McAlister.  For some
of the other witnesses, the Report does not refer to the IA history at all.   We found that the
Report's selective reporting of past IA investigations compromised the weight to be given to this
factor and raised adverse inference questions in the absence of any reference at all.

### 4.   The investigator did not evaluate witness biases.

The Report does not address potential biases to the extent such biases may impact a witness'
credibility.  For example, a witness who applied for but was not selected as the Police Chief may
harbor a negative bias against the Police Chief.  In addition, a witness who admitted to a past
personal relationship with Mr. Vanegas may have an inherent bias in favor of Mr. Vanegas.
Further, a witness who was subjected to adverse disciplinary action by Chief McAlister may be
biased against the Chief.

### 5.   The lack of standards resulted in an inconsistent weighing of the record.

Generally, the Report appeared to give greater weight to statements that could be used against
Chief McAlister.  On the other hand, the Report appeared to discount the weight to be given to
statements that reflected negatively on Complainants or witnesses, or did not provide any
information that could be used against the Police Chief.  For example, Ms. Nuckolls claimed that
one witness "didn't offer much information either way" even though that witness described the
Police Department staff as insubordinate and disrespectful towards the Chief.

FOR PUBLIC RELEASE

In addition, there were at least three individuals who asked to speak with Ms. Nuckolls to provide a statement during her investigation. Ms. Nuckolls had not intended to interview these witnesses, despite the fact that their knowledge was crucial to the complaints that she was investigating, and questioned their credibility without providing any foundation. We understand that these three individuals provided information that contradicted the allegations made against the Police Chief or offered a different perspective with respect to interactions with the Police Chief. The Report discounted any positive statements about the Chief by one voluntary witness because the witness did not offer "constructive criticism" of the Chief. Another voluntary witness' statement was disregarded because was considered a mere "character witness." The Report did not even mention the interview of a third voluntary witness who provided positive comments about the Chief because she did not consider the interview to be "official."

### 6. The Report's assessment of Chief McAlister's credibility was based upon an incomplete and flawed investigation.

Finally, we found Ms. Nuckolls' assessment of Chief McAlister's credibility to be flawed and deficient. The Report concluded that the Police Chief was not credible because she was allegedly "untruthful" about whether she "self-reported" a worker's compensation claim. The Report asserts that "self-reporting" a claim violates some unidentified General Order. The allegation of "untruthfulness" is based upon a telephone call by Ms. Nuckolls and Mr. Vanegas to VML, who verified that it had spoken directly with the Police Chief about her claim. Our independent investigation concludes that the investigator's findings were based upon an incomplete investigation and erroneous. As a threshold matter, General Order 122.3.6(B) provides that personnel who are injured must report their injury to their supervisor, who prepares the report of claim that is forwarded to the Police Chief, who forwards it to Human Resources. Here, the Police Chief was reporting her own injury, and her supervisor is the Town Manager. The Police Chief went to Town Hall to report her injury and spoke with the Director of Administration. Upon reporting her claim to the Town Manager's designee for coordinating claims, the Director of Administrator specifically instructed the Police Chief to report her claim. Thus, per General Order 122.3.6(B), the Police Chief properly reported her claim to her supervisor and only called VML to report the claim upon the express instruction of a competent authority. There is no basis for concluding that the Police Chief allegedly violated a General Order and that she was subsequently "untruthful" about it.

The Report also questioned the Chief's credibility because she certified that a sworn officer on her staff was a full-time law enforcement officer despite his administrative duties. The record shows that the Chief was accurately reporting this employee's status – he was both a full-time employee of the Department who had full law enforcement authority.

\* \* \* \* \* \*

In summary, our audit of Ms. Nuckolls' investigation revealed a number of concerns regarding the reliability of the Report. Ms. Nuckolls' credentials as an "HR consultant" could not be verified, and the resources that Mr. Vanegas said that he relied upon to validate her credentials are now unavailable. It appears to us that Ms. Nuckolls made credibility determinations without providing adequate record support and demonstrated her own bias by excluding statements that may contradict the Complainants or that may potentially be favorable or positive about Chief

FOR PUBLIC RELEASE

McAlister. We found that her credibility assessments were not based upon an articulated standard. We also found the credibility determinations to be inconsistent, based upon inaccurate or incomplete information, and vague and conclusory.

## B. The Investigator's Findings Are Not Supported By Record Evidence

To our knowledge, neither Ms. Nuckolls nor Mr. Vanegas appear to have any experience working as police officers, in managing police departments or investigating police departments. We also note that Ms. Nuckolls and Mr. Vanegas did not engage a consultant who is an expert in police procedures, management and administration to evaluate the merits of the complaints against the Chief of Police. Specifically, the Police Department's policies and procedures (known as General Orders) serve as guidelines to direct the work of the department. The General Orders comply with the standards set by the state accreditation agency. The lack of such expertise immediately questions the weight to be given to Ms. Nuckolls' determination on the merits of the complaints.

### 1. The Complainants never asserted a claim of hostile work environment based upon a protected class; thus, it should not have been part of this Report

The Report concluded that "[b]ased on the evidence provided during this investigation, … there is no evidence to support a finding that Chief McAlister took any action because of any individual's protected trait." Thus, it appears on the face of the Report that the Complainants lodged a complaint of discriminatory conduct by the Chief.

At no time, however, did any of the Complainants allege any discriminatory conduct by Chief McAlister. According to Mr. Vanegas, this section was written to exonerate Chief McAlister and to clarify that the Complainants' purported "hostile work environment" claims were based upon allegations of employee intimidation and not a protected class. However, the section, as written, does not make that clarification. Instead, the plain language of the Report communicated that the Complainants alleged discriminatory conduct based upon a protected class and that the allegations could not be substantiated "[b]ased on the evidence provided during this investigation."

### 2. The findings that Chief McAlister acted outside the scope of her authority are not supported by record evidence.

The Report then focused on whether Chief McAlister acted outside the scope of her authority or engaged in misconduct as the Chief of Police by seeking sworn status for the Department's Business Manager and providing the title of "investigator" or "detective." The Report characterized the Chief's decision as a violation of hiring practices, fraudulent, and a violation of state law. In fact, she went as far as to say that Business Manager had been "*impersonating a Purcellville police officer*" while holding the position of Business Manager.

As a threshold matter, the Chief of Police serves as the agency's policy maker, hiring authority, and arbiter of discipline. As such, he or she has broad authority to make personnel decisions that he or she believes may be in the best interest of the department and the most efficient and

FOR PUBLIC RELEASE

effective use of departmental resources. Under Purcellville Town Code, § 42-32,[10] the Police Chief reports to the Town Manager, who may define the scope of the Chief's authority. Thus, to evaluate whether the Police Chief was acting within the scope of her authority, the investigator should have interviewed the individuals who would have defined the scope of her authority, such as the former Town Manager or the former Assistant Town Manager, both of whom had institutional knowledge of the operation and management of the Police Department. She did not. Our preliminary investigation confirmed that the former Town Manager and the former Assistant Town Manager approved sworn status for the Department's Business Manager.

The Report's conclusions of alleged fraud and state law violations significantly exceed the scope of the investigator's knowledge and experience. In addition, the Report's conclusion was contrary to the record. There is no dispute that the Business Manager had 16 years of experience as a certified law enforcement officer, a motorcycle master instructor and an Emergency Vehicle Operations Course (EVOC) Instructor prior to joining the Purcellville Police Department. There is also no dispute that the Business Manager went to Loudoun County Circuit Court, and received his oath of office from the Clerk of Court. Thus, he was in fact a sworn and certified law enforcement officer for Purcellville. Therefore, rather than "impersonating a Purcellville police officer," the record is clear that he was in fact a sworn law enforcement officer for Purcellville.

Ms. Nuckolls also concluded that the Chief exceeded the scope of her authority when she purportedly instructed her staff not to speak with persons in Town Hall or Town Council members regarding police department business during a meeting that took place at Patrick Henry College. This finding appears to have been made solely on the allegations of the Complainants. The Report does not indicate whether any of the other witnesses corroborated this allegation.

The Report was highly critical of Chief McAlister allowing a Police Department staff member to review In-Car Video (ICV or dash camera videos) and called it a "*waste of town resources and contrary to best practices.*" Ms. Nuckolls failed to cite the basis and authority for her conclusions regarding "*best practices.*" According to Chief Longo, a police department has an affirmative duty to periodically audit such videos in an effort to ensure the functionality of the equipment, the appropriateness of its use, and as an accountability tool that monitors police and citizen interactions. This is a standard established by the Virginia Law Enforcement Professional Standards Commission (*see https://www.dcjs.virginia.gov/sites/dcjs.virginia.gov/files/publications/law-enforcement/7th-edition-virginia-law-enforcement-accreditation-program-manual.pdf*).

To comply with this accreditation standard, the Purcellville Police Department issued General Order 141.3.6, which provides:

---

[10] This section provides: "The police department shall be under the control of the town manager for the purpose of preserving and enforcing peace and order, for the execution of the laws of the state and this Code and other ordinances of the town, and the performance of such other duties as the town manager may prescribe." Purcellville Tow Code, § 42-32.

FOR PUBLIC RELEASE

**I. PURPOSE**

The purpose of this document is to establish policy for use of the In-Car Video (ICV) system, and to specify requirements pertinent to storage, viewing, release, and retention of ICV generated materials. The Department has adopted the use of ICV to provide an accurate depiction of events for courtroom presentation, as an investigative tool to accurately capture statements and events during the course of an incident, and to enhance an officer's ability to document and review statements and actions for report purposes and for courtroom preparation. Additionally, ICV material can be used to provide an impartial measurement for self-critique and field evaluation during new-officer training.

General Order 141.3.6 (Section VI) further provides:

> D. Supervisors shall review their officers' ICV recordings for the purposes of gathering information that may be useful in preparing employee evaluations or establishing training needs. A supervisor may request a DVD of the ICV audio/video material for training purposes. When a recording is burned to DVD for training purposes, a copy may also be forwarded to the Criminal Justice Academy if the training would be beneficial for training others.

Thus, to suggest that reviewing ICV video is *"contrary to best practices"* was inaccurate. In light of staffing levels, it was within the Chief's prerogative to assign the duty of auditing and inspecting departmental equipment to whomever she deemed appropriate.

Ms. Nuckolls also concluded that the Chief sought to use her position to compel an officer to issue a traffic infraction citation to a Town Council member who was allegedly captured on dash cam video committing a traffic violation. In our opinion, the Report does not provide sufficient factual support for this conclusion.

Finally, the Report concludes that the Chief acted inappropriately by showing the video to the relevant Town Council Member. We do not believe that there is any basis for this finding. The Chief of Police is the custodian of those records, and the decision to make public those records was within her discretion under the Virginia Freedom of Information Act. *See* General Order 141.3.6 (Section X(B)). Thus, the fact that the Chief chose to make a copy of the video and disclose it to the Council Member is not an act that is outside the scope of her authority.

### 3. The conclusion that Chief McAlister was untruthful is not supported by record evidence.

The Report concluded that Chief McAlister was untruthful with respect to the following four areas: (1) presenting the Business Manager to the Clerk of the Court as a Law Enforcement Officer, (2) making false statements to the Assessors from the Virginia Law Enforcement Professional Standards Commission regarding a former employee's failure to maintain the property room, (3) self-reporting a Worker's Compensation claim, and (4) claiming attendance at the FBI National Academy on her resume and employment application.

FOR PUBLIC RELEASE

Whether or not untruthfulness rises to the level of impeachment evidence is squarely within the purview of the Commonwealth's Attorney to determine. Regardless, sustained findings of untruthfulness are incredibly harmful to a law enforcement officer's career and lead to separation. Thus, when the material question of untruthfulness is in dispute, the investigation must be thorough and must firmly establish untruthfulness by a preponderance of the evidence.

There is no factual support for the conclusion that Chief McAlister was untruthful in presenting the Business Manager to the Loudoun County Circuit Court Clerk of Court to be sworn as a law enforcement officer. There is no dispute that the Business Manager had prior law enforcement experience, and that he had been a certified law enforcement officer in his prior position. The Report does not state that the Business Manager was not qualified or that he did not have the proper certifications. The Report also does not describe any steps taken to determine when this individual last received in-service credits from the Department of Criminal Justice Services, or whether he was eligible to be recertified as a law enforcement officer in the Commonwealth. According to Chief Longo, police officers are frequently hired and presented to the Clerk of Court to be sworn even before they complete basic law enforcement training. In addition, departments are afforded a period of time from the date of hire to have the officer trained and certified by the Department of Criminal Justice Services.

There is also no factual support for the Report's conclusion that Chief McAlister was untruthful to the Virginia Law Enforcement Professional Standards Commission with respect to a former employee's maintenance of the property room. The record provided a sufficient basis for the Chief's displeasure with the manner in which the former employee maintained the evidence room. This can be evidenced in the Chief's discussion with the former employee prior to reaching a disciplinary decision in his case.

Chief Longo, who served as both the chair of the Virginia Law Enforcement Professional Standards Commission and was a long-standing board member, advises that failures in the evidence process can lead to an agency's inability to successfully undergo assessment or reassessment. In that regard, it is not unusual for a Chief to take the opportunity to communicate with the assessment team and the Commission about any areas where he or she believes the department may have fallen short in the evidence process. Here, we have seen no evidence that supports Ms. Nuckolls conclusion that the Chief of Police sought to mislead the Commission, and thus, was untruthful.

With respect to the Worker's Compensation claim, there is no dispute that a claim was filed by Chief McAlister in April 2017 --- almost six months before Ms. Nuckolls interviewed the Chief as part of the investigation. The Report concluded that Chief McAlister violated an unidentified General Order by self-reporting the claim and that the Chief was not being truthful when she denied self-reporting the claim. Such a conclusion, however, was not supported by the record. The record shows that Chief McAlister reported her injury to the Town and that she was directed by the Town to report the injury to VML. Thus, the Chief complied with the General Order. We believe Ms. Nuckolls should have spoken with the Director of Administration, who handles the Town's worker's compensation claims. However, she did not.

FOR PUBLIC RELEASE

Lastly, Ms. Nuckolls claimed that Chief McAlister lied about attending the FBI National Academy because it was not listed on a list of training courses completed by the Chief throughout her career. We found, however, that Chief McAlister attended and completed the National Academy in the spring of 2010. This information was readily obtainable through the University of Virginia, School of Continuing and Professional Studies, Student Registrar. We see no evidence that Ms. Nuckolls attempted to confirm this fact before accusing the Chief of lying.

### 4.  Chief McAlister's Role in Internal Affairs investigations

Ms. Nuckolls also reviewed two previous IA investigations. She concluded that Chief McAlister departed from established policy in conducting the Internal Affairs investigations into allegations of misconduct by two former officers.

Ms. Nuckolls concluded that Chief McAlister "tampered" with and "compromised the integrity" of the IA investigation that resulted in the termination of former officer #1. Specifically, Ms. Nuckolls found that Chief McAlister violated General Order 152.1.6 based upon her conclusion the former officer was not "duly notified he was being investigated for any wrong doing" at the time that he lied to his supervisors. Ms. Nuckolls appears to believe that an untruthful statement made to supervisors before a formal IA charge is filed cannot be considered as part of an IA investigation. Her conclusion appears to be based upon a misunderstanding of the IA process and is not supported by the record.

As a general matter, the purpose of an IA investigation is to review an officer's conduct that resulted in the allegation of misconduct. *See* General Order 152.1.1. With respect to former officer #1, he was charged with, among others, violating General Order A-21, which provides: "When questioned by competent authority, employees shall give complete and honest answers to any question related to their official duties, their fitness to hold public office, or violation(s) of the regulations or general orders of the Department." General Order A-21 is not part of the General Order on internal affairs investigations (i.e., General Order 152). Instead, the duty to give "complete and honest answers" when "questioned by competent authority" is a general responsibility that applies at all times. Former officer #1 admitted that he had lied when he was questioned by competent authority about a department issue. Thus, we believe that Ms. Nuckolls incorrectly concluded that the Department improperly investigated this alleged misconduct through its IA function. *See* General Order 152.1.1(E).

Ms. Nuckolls also found that Chief McAlister "ran point on the investigation" and "conducted all the interviews (at her own admission)," which violated General Order 152.1.4. This finding is not supported by the record. In this regard, Chief McAlister was interviewed over the course of two days, and at no time during her interview did she "admit" to conducting the interviews for this IA investigation. In addition, contrary to Ms. Nuckolls' finding, the record shows that the Chief met with former officer #1 at the conclusion of the investigation and only asked him three questions, all of which pertained to the investigative process and not about the substantive issues. The record appears to show that Chief McAlister reviewed and relied upon the findings and recommendations of the investigating officer.

With respect to the investigation of misconduct by former officer #2, Ms. Nuckolls found that Chief McAlister violated General Order 152.1.6 because she did not provide proper notice of the

FOR PUBLIC RELEASE

"nature of the investigation." Ms. Nuckolls also found that Chief McAlister violated General Order 152.1.2 because she assigned a corporal rather than a sergeant to conduct the IA investigation. She then concluded that Chief McAlister's alleged "involvement resulted in 'tampering with IA investigations' and compromised the integrity of the IA process." Notwithstanding these alleged violations, Ms. Nuckolls concluded that these technical violations "wouldn't change the outcome" and "created unnecessary liability" for the Town. On their face, Ms. Nuckolls' findings are very broad and general. She does not describe the Chief's alleged "involvement" and does not provide any foundation to support her conclusion that such alleged conduct tampered with and adversely affected the integrity of the investigation. She also does not provide any information regarding the alleged "unnecessary liability" created. Despite these putative concerns, Ms. Nuckolls then states, again without foundation, that these alleged violations "wouldn't change the outcome" for former officer #2.

In summary, we believe that Ms. Nuckolls' conclusions that Chief McAlister violated Department policies or procedures with respect to the IA investigation of former officers #1 and #2 lack sufficient factual basis. In addition, based upon the record evidence, we do not believe that the Report's findings are credible or reliable.

### 5. Chief McAlister did not make any fraudulent statements regarding the Business Manager's status as a law enforcement officer

Relying upon Ms. Nuckolls' finding that the Business Manager was not a properly sworn law enforcement officer, Mr. Vanegas then referred the matter to the Commonwealth Attorney's office.

Specifically, Ms. Nuckolls concluded that Chief McAlister falsely certified on January 9, 2017, that the Business Manager was a full-time law enforcement officer on the Initial Employment form submitted to the Virginia Department of Criminal Justice Services. Mr. Vanegas attempted to defend this finding by asserting that the Business Manager was a full-time civilian employee and therefore could not have been a full-time law enforcement officer. The record shows that the Business Manager was, in fact, both.

The record shows that the Business Manager position is a civilian position. However, once the incumbent was hired, the Chief sought permission from the former Assistant Town Manager, who was responsible for overseeing the police department, to make the incumbent a sworn law enforcement officer based upon his prior experience while he continued to perform his civilian duties so that he would be able to respond to calls if and when necessary. The intent was not to change the job description from a civilian, administrative post, to a law enforcement position, but to allow the Business Manager, who qualified as a certified law enforcement officer, to be properly empowered and credentialed to respond as a law enforcement officer if and when necessary. The primary intent was to help alleviate staffing issues and to spread out some of the administrative burdens on the Complainants, such as internal and criminal investigations, performing tasks to further the Chief's directives, responding to emergency calls, and community

FOR PUBLIC RELEASE

service events.[11]  The budget impact was negligible (about $1,000 for equipment and uniform), and there was no change in his compensation or the Town's costs for officers' retirement plans.[12]

Both the former Town Manager and the former Assistant Town Manager approved this request. Consequently, the Business Manager, who remained in a civilian position, was sworn in as a law enforcement officer on December 22, 2016.  Thus, at the time that Chief McAlister signed Form 21 on January 9, 2017, the Business Manager was a full-time sworn law enforcement officer who would primarily be performing non-police/administrative work. Accordingly, Chief McAlister did not make any false statement with respect to this form.

In summary, there was no basis for referring the Chief's certification to the Commonwealth Attorney's office for possible criminal charges.

### 6.  Ms. Nuckolls did not disclose evidence of her own potential bias

Our investigation revealed that Ms. Nuckolls was in contact with one of the former officers (former officer #1) who was terminated for misconduct.  Despite the fact that she was not an attorney, she told former officer #1 that he had been "wrongfully terminated."  By email dated November 16, 2017, she stated that she would "provide [him] a copy of the information pertaining to the re-investigation of [his] IA," and further promised to "draft up a summary that explains in detail everything that was done on [his] behalf during [her] investigation."

We were unable to determine if Ms. Nuckolls actually provided this information.  As noted above, she refused our requests for interview.  In any event, as a consultant hired by the Town to perform an independent investigation for the Town, it is our view that Ms. Nuckolls' communications with former officer #1 and her promise to him to provide confidential information that he could potentially use against the Town, presented a conflict of interest and a potential breach of the confidentiality obligations under the terms of her engagement.

### 7.  Ms. Nuckolls' finding of retaliation appears unsubstantiated.

One of the Complainants alleged that a disciplinary action was issued for violating the personal appearance provision after the Complainant circulated an article about management style (namely, an article enumerating the mistakes made by bosses – like the Chief) to the entire police department.  Our investigation confirmed that the Complainant's appearance did, in fact, violate the General Order.  Thus, there was a legitimate reason for this Counseling Form.  Nonetheless, the Report concluded that this counseling form was retaliatory because this Complainant had

---

[11] Mr. Vanegas argued that the Police Department was not budgeted or approved to have a "Detective." This may be true, but the Business Manager was not promoted to "Detective." He was assigned the use of the title to facilitate his background investigative work for the department, and did not receive a pay increase when he became a sworn officer.

[12] Mr. Vanegas attempts to justify his action by asserting that the Chief's signature on this form amounted to "fraudulent use" of Town resources because the Town would be paying more in LEOS retirement contributions. Mr. Vanegas' understanding is inaccurate. We note that Mr. Vanegas made no effort to determine if there was, in fact, an increased cost associated with making the Business Manager a sworn officer. He did not check budget documents or ask for any information related to the Town's LEOS supplement. To the contrary, the justification for making the incumbent a sworn law enforcement officer noted that there was NO additional cost to the LEOS supplement.

FOP PUBLIC RELEASE

repeatedly violated this provision prior to the issue of the counseling form. Ms. Nuckolls does not provide any factual support for this finding.

We note that this form was not signed by the Complainant or the Sergeant who issued it. In addition, the original form is not found in the personnel files that were kept in Mr. Vanegas' office. Thus, further investigation is warranted to determine if it was actually issued. Accordingly, Ms. Nuckolls' findings appear to be based upon an incomplete record and lacks factual support.

### 8. Chief McAlister did not violate "Town Process" with respect to a modification of an ordinance pre-empted by Virginia law

The Report concluded that Chief McAlister violated some unidentified "Town Process" by "[a]ttempting to go around Town Council and the Town Manager" to seek a modification of Purcellville Ordinance Section 46-14. We do not believe that this conclusion is supported by the record.

On June 20, 2017, Chief McAlister sought legal counsel from the Town Attorney regarding her authority to issue a special permit under Purcellville Ordinance Section 46-14 after an inquiry from a citizen. The Chief conferred with the Town Attorney, who provided her legal opinion regarding the Code provision and explained the process for legislative modifications. This process included the preparation of a staff report by the Town Attorney with her legal analysis and recommendations. The Town Manager is not involved in this process, and there is no "Town Process" that required the Chief to go to the Town Manager, who is not an attorney, for legal guidance. Chief McAlister readily conceded that she was not the decision-maker with respect to legislative changes to the Town Code.

Accordingly, there is no basis for the conclusion that the Chief was attempting to "go around" the Town Manager. Thus, we find that the Report erroneously concluded that Chief McAlister was "in clear violation of Town Process."

## V.    CONCLUSION AND RECOMMENDATION

As we noted at the beginning of this Report, we focused solely on the methodology of Ms. Nuckolls' investigation. For all of the foregoing reasons, we do not believe that the Town can rely upon Ms. Nuckolls' Report for any purpose. Based upon the completion of the first phase of our audit, we do not believe that the Report represents a fair, unbiased, and thorough investigation. Thus, we recommend that the Report be disregarded in its entirety.

At this time, we recommend that the Town continue its investigation into the merits of the complaints filed against Chief McAlister to properly evaluate the merits of such complaints.

**From:** Georgia Nuckolls <prohrsvs@gmail.com>
**Sent:** Sunday, October 15, 2017 2:55 PM
**To:** Vanegas, Alex
**Subject:** Defrauding the Town of Purcellville

Bid - Email

Alex Vanegas,

You were in a personal relationship with me starting in JULY!! You defrauded the TOWN and awarded the HR Contract to me because you were DATING ME. Regardless of my skills- you wanted me close. And you used our relationship to gain this sick power/control over me. You KNEW I wouldn't leave or bail. You even told Sheryl Hood and Joe Schroeck about our relationship. Even though I worked countless hours-- and at every turn I was RIGHT and built and iron clad case against Chief McAlister that you NEVER had to begin with. What did I get for that? Being lied too, mistreated, hurt, and ultimately humiliated! So when you ask "why" look in the mirror Alex... you are why. Treating women like expendable whores, doing inappropriate things in your office only to make them feel cheap and dirty, all in an effort to do your bidding is unacceptable. Your lies and broken promises have finally caught up with you. Emotionally tormenting someone to the point of landing them in the hospital (multiple times) is sickening. And putting on this display so my daughter bares witness to hurt and pain I've endured is stomach turning. You are not the man you claim to be.

Regards

**Georgia Nuckolls, SPHRi, MBA**
*ProHR,*
**Professional Outsourced HR Services...**
**703.517.6627**

1



**From:** Schroeck, Joe <jschroec@purcellvilleva.gov>
**Sent:** Tuesday, October 10, 2017 11:23 PM
**To:** Georgia Nuckolls
**Subject:** Re: IA Case

Yes indeed. I think that we meaning you, I, and Clark need to meet tomorrow to go over logistics

On Oct 10, 2017, at 10:30 PM, Georgia Nuckolls <prohrsvs@gmail.com> wrote:

> I have no doubt you've got this under control. Just want to make sure
> we're on the same page regarding wording. Can you bring everything by
> Alex's office so we can ensure everything is perfect for Thursday.
>
> On Tue, Oct 10, 2017 at 9:40 PM, Schroeck, Joe <jschroec@purcellvilleva.gov> wrote:
> Georgia,
>
> I will assist Clark McDaniel with that. I have a board of directors meeting at the Academy from
> 1030am to around noon and then be back in town.
>
> Joe
>
> Get Outlook for iOS
>
>
>
> On Tue, Oct 10, 2017 at 8:49 PM -0400, "Georgia Nuckolls" <prohrsvs@gmail.com> wrote:
>
> Hi Joe,
>
> Alex and I will swing by tomorrow to look at the IA Files and 'assign' an IA
> case number to the new investigation underway. If you could please pull
> together the folder and whatever paperwork your team normally uses for
> IA's that would be great.
>
> Please pull these documents together discretely as we don't want to raise
> any suspicions or peak anyone's curiosity.
>
> Thank you for all your help!!
>
> Tae care,
> Georgia
>
> --
>
> Georgia Nuckolls, SPHRi, MBA
> *Pro*HR,
> 1



| | |
|---|---|
| **From:** | Georgia Nuckolls <gnuckolls410@gmail.com> |
| **Sent:** | Thursday, November 16, 2017 1:40 PM |
| **Cc:** | Vanegas, Alex |
| **Subject:** | Investigation Report |

Hi Tim,

It was great speaking with you. I'm so sorry The Town has yet to do anything to correct the wrongful termination you suffered.

I'll provide you a copy of the information pertaining to the re-investigation of your IA. Further, I'll draft up a summary that explains in detail everything that was done on your behalf during my investigation.

I'll be in touch!!

Take care,
Georgia

1



**kfraley9121@outlook.com**

| | |
|---|---|
| **From:** | Kermode, Christa <ckermode@purcellvilleva.gov> |
| **Sent:** | Wednesday, October 11, 2017 9:19 AM |
| **To:** | Police Dept |
| **Subject:** | Kris's Grandmother passed away on Tuesday 10/10 |

Hi Folks,
It is with a heavy heart that I pass along the sad the news that Kris's grandmother passed away yesterday 10/10/17. I will keep you posted on details. Please keep their family in your thoughts and prayers.

Thank you,

Christa M. Kermode

Administrative Assistant
**Purcellville Police Department**
125 Hirst Rd Suite 7A I Purcellville, Va. 20132
**O:** 540.338.7422  I  **F:** 540.751.1697



*This email and any attachments to it may be confidential and are intended solely for the use of the individual to whom it is addressed. Any views or opinions expressed are solely those of the author and do not necessarily represent those of the Purcellville Police Department.*

*If you are not the intended recipient of this email, you must neither take any action based upon its contents, nor copy or show it to anyone.*

*Please contact the sender if you believe you have received this email in error.*

1



# M Gmail

---

## Fwd: FW: Our Deepest Condolences

Sun, Jun 23, 2019 at 4:56 PM

To:

---------- Forwarded message ----------
From:
Date: Tue, May 14, 2019, 20:56
Subject: FW: Our Deepest Condolences
To:
Cc

-----Original Message-----
From: Georgia Nuckolls [mail to:prohrsvs@gmail.com]
Sent: October 10, 2017 8:56 PM
To: Fraley, Kristopher [mail to:kfraley@purcellvilleva.gov]
CC: Vanegas, Alex [mail to:avanegas@purcellvilleva.gov]
Subject: Our Deepest Condolences

Good Evening Kris,

We heard the news today of your Grandmothers passing..Coping with loss is a process and can be difficult, if you need anything please don't hesitate to reach out. Take care of yourself and we'll see you when you get back.

I heard you'll be out Wednesday- please don't worry about our meeting time.  I simply carved out the same time for us on Thursday (11:00 AM).  No biggie.

Take very good care,
Georgia

--
Georgia Nuckolls, SPHRi, MBA
*ProHR,*
Professional Outsourced HR Services...
703.517.6627



| | |
|---|---|
| **From:** | Vanegas, Alex |
| **To:** | Kasmier, Jesse; Bohince, Shannon |
| **Subject:** | Video camera |
| **Date:** | Thursday, October 12, 2017 8:47:30 AM |

Ross & Shannon,

I need to make sure that all the users of the video surveillance camera of the heritage room are temporarily blocked from 11 AM to 3 PM. I would also like to make a video recording of the heritage room during the a for mentioned time. In addition, please make the video an unsearchable file that requires staff to go to IT to obtain the video. I appreciate this confidentiality during our investigation. Please let me know if you have any questions.

Best regards.

Alex

Sent from my iPhone



# Purcellville Police Department

## MEMORANDUM

**TO:** Officer Kris Fraley

**DATE:** 10/12/2017

**FROM:** Sgt. Clark McDaniel

**FILE:** 2017- IA- 12

**SUBJECT:** Notification of Investigation

**RE:** Sworn Employee Notice

The purpose of this memorandum is to inform you that the Police Department is conducting an administrative investigation to determine all information, facts and circumstances relevant to:

Allegations and statements, you made to competent authority during two separate IA Investigation's; one regarding former Sgt. Guy Dinkins and another regarding former Officer Tim Hood.

In addition to me, the following person(s) will (or could) be present during the interview:

- Georgia Nuckolls, SPHRi, MBA, Independent HR Consultant
- Daryl DeBow, CCE, CFLE, Polygraph Examiner
- Corporal Paul Kakol, Purcellville Police Department

This notification is required by Section 9.1-501 of the Code of Virginia, which states, in part:

"1) Any questioning of the officers shall take place at a reasonable time and place as designated by the investigating officer, preferably when the officer under investigation is on duty and at the office of the command of the investigating officer or at the office of the local precinct or police unit of the officer being investigated, unless circumstances dictate otherwise."

"2) Prior to being questioned, the officer shall be informed of (i) the name and rank of the investigating officer and of any individual to be present during the questioning and (ii) the nature of the investigation."

Relative to this investigation, your responsibilities are defined in General Orders, 152.1.6 and 152.1.7, which are:

152.1.6B. Each employee of the Department shall cooperate fully with personnel who are conducting an internal affairs investigation.



Name
Page 2
October 12, 2017

152.1.6C. It is the responsibility of all employees to answer fully and truthfully any question asked by competent authority that pertains to any investigation, possible infraction of law or regulation, or action taken by the employee that may affect the standing or reputation of the Purcellville Police.

152.1.6D. During the course of an internal investigation, employees do not have the right to refuse to answer any question concerning their performance of duty or their adherence to departmental rules and regulations. Admissions by the employee cannot be used in any subsequent criminal prosecution. As soon as it appears the investigation may lead to a criminal prosecution the concerned employee will be advised of certain rights as required by law.

152.1.7A. An officer will be required to disclose financial information only when such information is necessary and in accordance with the Code of Virginia Section 2.1-116.3. "Personal Assets of Officer."

152.1.7B. If, during the course of an internal investigation, the investigating officer determines cause exists to justify an employee's submission to a medical, physical, psychiatric, laboratory, or polygraph examination, the employee shall submit to such test or exam. These tests may include breathalyzer, blood tests, urine tests, the taking of photographs or attendance at physical line-ups, the submitting of voice or handwriting samples, or the taking of polygraph examinations. The Watch Commander supervising the investigation will be responsible for consulting with the Chief of Police for approval for such tests or exams, except in cases where a time delay would directly affect the outcome of the test such as a test for blood alcohol content. If the Chief of Police is unavailable. the appointed designee shall be consulted.

152.1.7C. Testing blood or urine specimens to determine whether sworn employees have used drugs or alcohol shall be in accordance with The Code of Virginia, Section 2.1-116.2, "Conduct of Investigation."

As with other provisions of the Purcellville Police Manual, your failure to meet these responsibilities may result in disciplinary action.

You are further advised that statements obtained from you during the course of this administrative investigation are compelled as a condition of your employment. As such, these statements cannot be used against you in a criminal prosecution.

You are instructed not to discuss this investigation with others unless authorized by the investigative authority.

When your statement, if recorded, is transcribed to written form, you will be provided with an opportunity to review and sign the transcript. If you so desire, a copy of the statement containing your signature will be provided to you at the time of your review.

Name
Page 3
October 12, 2017

I have read and understand the information contained in this document.

_____
Notice Received

10/12/2017
Date

 Purcellville Police Department

## MEMORANDUM

**DATE: October 12, 2017**

**TO: Officer Kris Fraley**

**FROM: Sgt. Clark McDaniel**

**SUBJECT: Relief of Duty**

**REF: 2017-IA-12**

Effective, October 12, 2017 you are hereby relieved of your official law enforcement duties. This action is being taken because of the active investigation, 2017- IA-12, currently being investigated.

I provided you with your "Notice of Administrative Investigation" (form PP111) on October 12, 2017. The investigation is regarding Allegations and statements, you made to competent authority during two separate IA Investigation's; one regarding former Sgt. Guy Dinkins and another regarding former Officer Tim Hood. Possible General Order violations are:

> Regulation A-3 Obedience to Laws and Regulations as it pertains to Regulation A-21 Truthfulness

You are ordered to relinquish the following items:
- Credentials/Badge
- Issued Weapon
- Magazines with rounds
- Swipe Card

You will be required to attend a hearing with Interim Chief Schroeck on Monday, October 16, 2017 at the PPD at 11:00 AM. He will then notify you by October 18, 2017, of the findings regarding your relief status.

During this time, you will be on administrative leave with pay, and must be available Monday through Friday 8:00 a.m. – 4:30 p.m. for any meetings or telephone calls.



EXHIBIT
14



PLAINTIFF'S
EXHIBIT
150

Elevator 02:32:41.421 PM 10/12/2017



Alex,

See below. Is there anything else in the file that would bear on Fraley's truthfulness?

**John C. Whitbeck, Jr.**
Whitbeck Cisneros McElroy, PC
(703) 777-1795 phone
(703) 777-9079 fax
jwhitbeck@whitbecklegal.com
www.whitbecklegal.com

Sent from a mobile device. Please excuse typos.

Begin forwarded message:

> **From:** "Perry, Ryan" <Ryan.Perry@loudoun.gov>
> **Date:** November 14, 2017 at 10:51:17 AM EST
> **To:** John Whitbeck <jwhitbeck@whitbecklegal.com>
> **Subject: More Purcellville**
>
> John,
>
> The PD handling the case insists that the items I have been provided do not encompass all that there is in the investigation into Fraley bearing on his truthfulness, and she plans on asking the court to again continue the case because she cannot get to the "bottom of the IA" until it concludes. As the town attorney for Purcellville in this matter, could you reach out to your client and then once again assure me, via email, that I have been provided with everything in this investigation bearing upon the credibility / truthfulness of Officer Fraley? Thus I can provide this assurance to the Court tomorrow when she attempts again to continue this case further to look into the investigation.
>
> Ryan W. Perry
> Senior Assistant Commonwealth's Attorney
> 20 E. Market Street
> Leesburg, Va. 20176
> (703) 777-0242

2



Lt,

Thank you for talking to me about the Fraley issue today.   I have included below the email I plan to send to the defense in my pending felony case. Could you review it and make sure I am not saying anything incorrect or untrue at this time?    Also, if you have an email or phone number that will reach Fraley, could you send that to me?  This way we can communicate whether or not he needs to show for subpoenas he has already been served with...   while we may not be putting him on the stand, unless our office releases him from subpoena, he has a duty to attend court when he has service.

Ryan W. Perry
Senior Assistant Commonwealth's Attorney
20 E. Market Street
Leesburg, Va. 20176
(703) 777-0242


Ms. Blake,

I write to inform you of potential Brady Material in the case of Commonwealth v. Chrostowski.  Officer Fraley, the lead officer in this case has been placed on administrative leave by the Purcellville Police Department.   It is my understanding that he has not been placed on leave for anything involving his investigation into cases or work on the street as a police officer.   Rather, they have placed him on leave to evaluate the truthfulness of a number of statements he made regarding another member of the Purcellville police department during an ongoing investigation into the conduct of that other individual.   I have been informed that the time period for this administrative leave will likely be between 30-40 days, although it could conclude much sooner.
Please let me know if you have any questions,

I remain,

Ryan W. Perry...

2

| | |
|---|---|
| **From:** | Georgia Nuckolls <georgia.nuckolls@hotmail.com> |
| **Sent:** | Tuesday, November 21, 2017 12:28 PM |
| **To:** | Only Town Council |
| **Cc:** | alex.vanegas.cpm@gmail.com |
| **Subject:** | Setting the record straight. |

-Enclosed, Private & Privileged Information-

Town Council,

Mr. Vanegas and I spoke after the closed session meeting you attended and I feel, given that information discussed in that closed session was twisted, manipulated, and then spoon fed to the press in a most unethical manner; some facts need to be pointed out.

Mr. Vanegas never said I was harassing or threatening him. In response to Mr. Plowman's question about how he felt regarding the emails that came in; emails he knew I did not send. Mr. Vanegas said, and I quote, "he felt harassed". Mr. Vanegas did not say, as was deliberately inaccurately reported to the media, that I harassed or threatened him.

Many of those emails came in when we were together speaking with staff, interviewing officers, etc. As far as we were concerned it was more of what we were already experiencing, attempting to derail our investigation. Countless times I went out to my car only find notes saying, "watch your back". Dealt with my tires being flattened. None of which was a secret. Mr. Vanegas was so concerned with my safety he ask many of the Purcellville Officers to look out for me. Did we formally report any of these things? No, because we were focused on getting through the investigation as quickly as possible. I also didn't want to give whomever was behind it any satisfaction that their efforts were effecting us. Every morning calls would come in from Council Members, Press, etc., regarding the status of the investigation and how quickly would it wrap up. Our days were such blur, rush rush rush.

Mr. Vanegas and I are good friends, we spent every day together for over a month and a half, and many hours working diligently to get through the investigation. We did so appropriately. We did not have sex, to clarify we did not have sex on or around or off of town property. To imply, infer, or say we did is not true.

I'm not discussing anything related to my past from over 20 years. It is irrelevant to the Consulting Assignment I completed and had no baring on the outcome. Attempting to discredit my investigation based on things that occurred over 20 years ago seems like a bit of a stretch. Until this investigation, no employer or client has ever questioned my background or attempted to smear my reputation. This appears more of a political attack, and a tasteless one at that.

Cynthia McAlister is human being, a person, and her name, like Mr Vanegas and myself, should not be trampled on publicly. Unethically leaking information in a twisted format to the press is certainly not what I expected from this Council or any of the members that attending that meeting. McAlister violated the rights of the seven officers who complained; but more so she violated her position, abused her authority, and made additional mistakes that couldn't be ignored. It doesn't make her a horrible person, but given the list we compiled she needed to be held accountable. It's a shame how it all ended up in the media circus as I have always maintained McAlister is entitled to her privacy.

1



I stand by my investigation and it's results. If you'd like to meet to discuss the investigation, I welcome the opportunity. Would appreciate the smear campaign against Mr. Vanegas and myself to cease and desist, and I know this Council has the power to do that. I have a family, most importantly a 15 year old daughter, that doesn't need to be subjected to this nonsense. My role in the investigation is done. The Town of Purcellville will either stand by investigation results, have another company or consultant reinvestigate, or just pay McAlister to go away.

I heard some concerning rumors regarding serious lies former Officer Fraley has been spreading. Outside of the fact former Officer Fraley a proven liar and failed his polygraph; I'd like to address his latest lies. I heard former Officer Fraley is alleging the day we polygraphed him I had him hand his gun and badge to me.?.? This is a complete fabrication of the truth. I never touched his weapon. Sergeant Clark McDaniel took those items from former Officer Fraley. Officer McDaniel also patted former Officer Fraley down. At that time a knife was found on his person, I believe former Officer Fraley took it out and handed it to Sergeant McDaniel. Former Officer Fraley got a second pat down by Daryl DeBow, the Polygraph Investigator. At this point in time former Officer Fraley still has his badge in his possession, and the Polygraphist instructed former Officer Fraley to remove it from his hip and give it to Sergeant McDaniel. The entire time I was instructed to sit to the right of Sergeant McDaniel the entire time because Sergeant McDaniel, Lt Schroeck, and Corporal Kakol feared for my safety. It was their opinion that Fraley could snap when asked for his weapons and wanted to keep me out of harms way. Corporal Kakol stood just outside of the conference room door in the event such an outburst occurred. When Fraley went in for polygraph, Sergeant McDaniel handed his gun to Interim Town Manager Vanegas who in turn locked the weapon up in his desk. Sergeant McDaniel came back later, after Fraley left town property to recover the weapon and place it back in the armory. You can verify these facts with Sergeant Clark McDaniel, Polygraphist Daryl DeBow, Corporal Paul Kakol, and Interim Town Manager Alex Vanegas.

Also, at no time did I ever shoot a gun on town property! Every person that attended the event can tell you we shot "bean bags". I was allowed to shoot bean bags once. Bean bags! You can verify these facts with Sergeant Clark McDaniel, Corporal Paul Kakol, and Interim Town Manager Alex Vanegas.

Another point that needs to made, allowing Sally Haskins to run this apparent witch hunt is a clear conflict. Ms. Haskins was named in my investigation in three places, as a Council you agreed to keep her from attending the Closed Session when the vote of no confidence was discussed. Your decision came after reviewing the evidence, page by page. Be advised, Patrice Clair did review my findings with Mr. Vanegas and myself, we spent over three hours reviewing the binder and editing the report at her office. If Patrice is now alleging that didn't occur, as a town you should reconsider paying the bill for that invoice. Most importantly, I was part of many discussions where it was made clear that well over half of the Council had decided Ms. Haskins termination was eminent. This doesn't appear convenient to any of you? Me. Haskins complained to Mr. Vanegas and I, claiming this Council was difficult, hard to work with, and unethically discredited her many times. Now Haskins running point on this highly suspect investigation/smear campaign?

On a final note, did this Council ever get to the bottom of all the McAlister emails that were deleted from the Town server? If you should terminate Mr. Vanegas who plans on taking point with the FBI? As many of you already know Rob Lohr's CPU is in the custody of the FBI. Many of these recent issues appear deliberate and malicious, retaliatory to be more specific. I'm shocked that anyone could legitimately buy into these frivolous allegations.

I have retained Counsel in light of the apparent smear campaign against Mr. Vanegas and myself. My objective is move past this without any further harassment or embarrassment to me or my family. It serves no purpose for this Council to continue to hurt, damage, or attempt to destroy reputations.

In addition, reviewing several emails obtained by the Tribune authored by then Chief McAlister, McAlister displayed little to no confidence or respect for her staff. In an email dated April 1, 2017, McAlister wrote to former town staff member Daniel Davis and former town manager Lohr, indicating that her second in command, Lt. Schroeck, along with Sgt Wagner, Sgt Owens, Sgt McDaniel, "should be extremely solid on police operations and they are not."

McAlister was addressing her justification of Dufek taking control and authority as a law enforcement officer at a Purcellville crime scene because she claimed her veteran staff did not do so properly.

In that same email, attempting to justify Dufek's actions, McAlister wrote, "I also had Lt. Schroeck lie to a reporter yesterday morning by telling her LCSO was handling this case, only because he did not want to speak to the media as he didn't know what to say. A prime example of my many frustrations!"

"We all start with a presumption of veracity, however, once the presumption is lost it cannot be regained and undermines the credibility and competency of the agency. I had to repair the damage he caused yesterday afternoon by explaining to the reporter, Major Poland and Kraig Troxell," wrote McAlister.

**Staff Terminations/Forced Resignations**

McAlister demonstrated a very open and known dislike and disrespect for many of her staff members.

Two staff members were caught in McAlister's cross-hairs.

One was Purcellville Police Sgt. Guy Dinkins, who was erroneously held under internal investigation by McAlister through knowingly false statements made by Officer Kristopher Fraley. Fraley, a fairly new officer, was very close to Dinkins but Dinkins was forced by circumstances to write up Fraley for failing to place a perpetrator's wallet in evidence, instead, taking it home with him for the weekend. Once Dinkins wrote him up, the relationship changed and Fraley retaliated, saying that Dinkins had spoken to him with foul language and remarks. McAlister capitalized on this through an internal affairs investigation instructing Fraley to make a formal complaint which stated he felt harassed and bullied by Dinkins.

Setting aside the actions of Fraley for a moment, McAlister assigned herself as lead internal investigator for nearly 45 days and only assigned another officer because she was going on vacation. McAlister again violated general orders by assigning an officer lower than the rank of Sergeant to replace herself as lead investigator. Sources indicate this was a standard practice if McAlister had the staff member in her crosshairs. Dinkins complained but to no avail. By doing so, she allowed herself to still run point and manipulate the investigation. It was found McAlister, not the assigned officer, conducted most of the interviews and, even though the assigned officer recommended just a few days of administrative leave, McAlister stepped in and informed Dinkins directly that he could either resign or he would be terminated.

McAlister was essentially judge, jury, and executioner. If terminated, Dinkins' potential to obtain another law enforcement related job would be severely diminished—next to impossible. Dinkins chose the path of least resistance



and resigned under duress. In the process of finding another job, Dinkins lost
his home, was forced to file bankruptcy, lost his retirement and now works in
construction.

McAlister pushed internal investigations of other officers as well, most later
closed as unfounded.

**The Human Resources Investigation**

Once an investigation into McAlister occurred, complaints of wrongful
terminations were front and center.

Dinkins' forced resignation inspired an independent polygraph of Fraley.

The polygraph, occurring on or about October 12, 2017, began with the
opportunity for Fraley to give his account of the incident(s) with Dinkins.

After the interview and a number of questions, the polygraph examiner noted,
"Deception Indicated."

Once the polygraph found Fraley to be lying, Fraley back peddled, admitting to
the polygraph examiner that "when the remarks were made, the Sergeant was
just kidding around."

Fraley also stated to the examiner that Chief McAlister instructed him to make
a formal written complaint against Sgt. Dinkins, which he did.

The polygraph examiner concluded, "It is this Examiner's position that the
Examinee [Fraley] did provide false information when filing the formal
complaint against Sgt. Dinkins and in the internal affairs investigation by taking
the various statements out of context and implying the comments were all
made in a serious supervision setting, which in his own admissions they were
not."

The Tribune verified Fraley was on administrative leave after the polygraph
results.

Multiple sources supported that McAlister grew to have little respect for her
staff and wanted to push them out, set them up, get rid of or terminate those
who she felt were not falling into place under her thumb. Many officers were
jockeying to switch to the night shift to avoid working around or getting in
McAlister's crosshairs.

A similar kangaroo court and another wrongful termination effort by McAlister
occurred with Officer Tim Hood. This time, however, McAlister never gave
Hood notice of an internal affair (IA) investigation and was found to have
violated Hood's Garrity Rights prior to terminating him. Law enforcement
officers will understand the implications of this but in sum, once an IA
investigation begins, notice must be given to the targeted officer. Officers also
have rights under a landmark 1967 Supreme Court case, Garrity v New Jersey.

Garrity Rights protect public employees from being compelled to
incriminate themselves during investigatory interviews conducted by their

Case 1:19-cv-01645-LO-JFA   Document 1-2   Filed 12/31/19   Page 101 of 103 PageID# 108

News Flash Home
The original item was published from 11/21/2017 3:08:39 PM to 12/6/2017 12:05:03 AM.
**Purcellville News Flash**

Posted on November 21, 2017

### [ARCHIVED] News Release - Interim Town Manager Placed on Administrative Leave

PURCELLVILLE, Va. November 21, 2017 — Effective today, November 21, 2017, Interim Town Manager Alex Vanegas has been placed on administrative leave pending the outcome of an independent administrative investigation. The Town is in the process of retaining an independent investigator to conduct an audit and investigation of actions taken by the Interim Town Manager over the last several months.

Mayor Kwasi Fraser met with Town staff this morning and expressed his support and confidence in Town employees in their ability to continue serving the Town of Purcellville with the highest level of care and professionalism. During the meeting the Mayor stated, "As we work to rebuild a positive, collaborative and stable organization, I want you all to know that my and Town Council's commitment with this effort will be to you, the employees. With your help, led by incredible department heads and management team, we will rebuild and move forward in a positive direction." He further stated "As soon as possible, we will be bringing on a paid professional to serve as the Interim Town Manager. This individual will work with the department heads, management team and staff to keep the Town moving in a forward direction.  Until we have this individual on board, Hooper McCann; in her role as Director of Administration, will have the full authority to conduct Town business in the capacity of an Interim Town Manager."

Administrative questions can be directed to Hooper McCann, Director of Administration, who will ensure such questions are directed to the appropriate Town individual. Questions concerning the investigation, should be directed to Sally Hankins, Town Attorney.



LAW OFFICES

## SEVILA, SAUNDERS, HUDDLESTON & WHITE

A PROFESSIONAL CORPORATION

POST OFFICE BOX 678
LEESBURG, VIRGINIA 20178-0678

ROBERT E SEVILA
JON D HUDDLESTON
CRAIG E WHITE
LAWRENCE M SCHONBERGER
WILLIAM R. FITZPATRICK
BENJAMIN B FITZGERALD
RACHEL K DOWNS
JEANINE M IRVING
R PENN BAIN
HEATHER S MILLER
KATHLEEN B HORNE

30 NORTH KING STREET
LEESBURG, VIRGINIA 20176

(703) 777-5700
FAX (703) 771-4161

www.sshw.com

April 12, 2018

RICHARD R SAUNDERS, JR (RETIRED)

### HAND-DELIVERY

Sally Hankins, Esq.
Office of the Town Attorney
221 South Nursery Avenue
Purcellville, VA 20132

Mayor Kwasi Fraser
Purcellville Town Hall
221 South Nursery Avenue
Purcellville, VA 20132

> Re:   Kris Fraley
>        Notice pursuant to § 15.2-209

Dear Ms. Hankins and Mayor Kwasi Fraser:

Please be advised that I am counsel for Kris Fraley, a sworn law-enforcement officer on administrative leave in the Town's employment.

Notice is given pursuant to Virginia Code § 15.2-209 that Kris Fraley was personally and professionally injured as a result of the negligence of the Town of Purcellville (a) through the Town's negligence and lack of professional diligence and investigation resulting in the securement of an agreement with Georgia Nuckolls to assist and/or direct the Town's human resources department; (b) in granting Ms. Nuckolls authority to conduct investigations within the Town's police department, including and especially as it related to the purported investigation of Kris Fraley on or about October 12, 2017, which occurred in part in the Town Administration building; (c), in relying upon the recommendations of Ms. Nuckolls and those she secured to assist her in placing Mr. Fraley on leave on or about October 12, 2017, with the clear and calculated intention to terminate his employment; (d) in failing to establish appropriate safeguards to insure that Mr. Nuckolls and other members of the Town staff would protect and otherwise not disseminate confidential information as it related to the investigation and to Mr. Fraley, resulting in the publication of defamatory comments and dissemination of a dubious polygraph report through the local news media (Loudoun Tribune – November 21, 2017 electronic edition); and, (e) in such other ways in which the Town's actions in hiring and failing

Sally Hankins, Esq.
Mayor Kwasi Fraser
April 12, 2018
Page 2 of 2


to supervise Ms. Nuckolls directly resulted in damages to Kris Fraley both professionally and personally.

     Please be further advised that such notice is given primarily as a courtesy with the understanding that the investigation as to Ms. Nuckolls' hiring and her activities related to the Police Department have been ongoing. As our contact with the law firm of Wilson Elser would suggest, we will remain cooperative with the investigation and confident that this matter will be concluded positively for all sides.

     Thank you for your attention. Should you have any questions, please feel free to contact me.

                          Sincerely,

                          William R. Fitzpatrick

WRF/ckq
cc:    Kris Fraley
       Yoora Pak, Esq.